Arlie Mack MOORE, Evanell E. Moore, Alfred L. Paulson, and Mary E. Paulson, doing business as Eugene Granite & Marble Works, Plaintiffs-Appellants,

v.

JAS. H. MATTHEWS & CO., Rest Haven Memorial Association, West Lawn Memorial Park, Lane Memorial Gardens, Eugene Memorial Gardens, Inc., Rest Lawn Memorial Park, Inc., Mt. Vernon Cemetery Association, Fir Grove Cemeteries Co., and Rhoden, Inc., Defendants-Appellees.

No. 75–3106.

United States Court of Appeals, Ninth Circuit.

March 29, 1977.

As Amended on Denial of Rehearing and Rehearing En Banc June 24, 1977.

Edward Ray Fechtel, Husband, Johnson & Fechtel, Eugene, Or., Roger Tilbury, Norman J. Wiener, Portland, Or., argued, for plaintiffs-appellants.

Jeffrey M. Batchelor, John G. Gearin, Gearin, Cheney, Landis, Aebi & Kelley, Joseph T. Hagen, Portland, Or., argued, for defendants-appellees.

Before WRIGHT and KILKENNY, Circuit Judges, and HARRIS, Senior District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

The plaintiffs in this private antitrust action alleged violations of sections 1 and 2 of the Sherman Act [15 U.S.C. §§ 1, 2] [1] and section 3 of the Clayton Act [15 U.S.C. § 14].[2] The issues on appeal involve: (1) tie-ins; (2) monopolization; (3) attempt to monopolize; and (4) concerted refusals to deal.

Suit was brought in 1969 and the first trial began in 1971. After Moore's opening statement and while the plaintiffs' first witness was testifying, the court invited defendants to move for summary judgment and a directed verdict. Once the motion was made, the district court dismissed all counts against them.

We reversed and remanded for a new trial and one was held, without a jury, on the issue of liability only. At its conclusion the trial court entered judgment for all defendants on all counts.

### FACTS

Appellants operate the Eugene Granite and Marble Works [EGM] as a partnership. It is in the retail grave memorial business and also operates an installation service for grave markers in Lane County, Oregon. It is the franchised dealer for two national cemetery memorial manufacturers and offers a full line of memorials including granite, bronze, flat and raised markers.

The eight appellee cemeteries, the principal ones in the Lane County area, accounted for 78% of all interments in Lane County between 1965 and 1974.

Appellee Jas. H. Matthews & Co. (Matthews) is a domestic manufacturer of bronze grave markers.

### I.

### TIE–INS

Tie-ins involve a seller's refusal to sell one product (the tying product) unless the buyer also purchases another (the tied product). *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 613–14, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

Such arrangements are presumptively illegal if certain elements exist and, once those are demonstrated, no specific showing of unreasonable anti-competitive effect is needed.[3] *Northern Pacific Ry. Co., supra*, 356 U.S. at 5–6, 78 S.Ct. 514.

* Of the Northern District of California.

1. Section 1 of the Sherman Act provides, in pertinent part:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . .
 Section 2 of the Sherman Act provides:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor. . . .

2. Section 3 of the Clayton Act reads:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machin-ery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

3. [T]he use of a tying device can rarely be harmonized with the strictures of the antitrust laws, which are intended primarily to preserve and stimulate competition.
 *Brown Shoe Co. v. United States*, 370 U.S. 294, 330, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962).

■ Three criteria must be found to establish the illegality of a tying arrangement. First, there must in fact be a tying arrangement between two distinct products or services. Second, the defendant must have sufficient economic power in the tying market to impose significant restrictions in the tied product market. Third, the amount of commerce in the tied product market must not be insubstantial. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 499, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (Fortner I), *quoting Northern Pacific Ry. Co., supra*, 356 U.S. at 5–6, 78 S.Ct. 514.

Appellants argue that two unlawful tie-ins have been demonstrated. First, they contend that it is illegal to tie the purchase of a cemetery lot (tying) with the requirement that purchasers of markers buy the memorial from or through the cemetery (tied). The record reveals that, contrary to the district court's finding, five cemeteries (Fir Grove, West Lawn, Springfield (Rhoden), Rest Haven and Rest Lawn) had such restrictions.

Second, appellants assert that it is impermissible to tie the purchase of the lot (tying) with the requirement that the buyer use the installation service of the cemetery (tied). All eight cemeteries required this condition.

## A. THE RATIONALE FOR PRESUMPTIVE ILLEGALITY.

■ The rationale for proscribing the practice of tie-ins rests on the leverage theory. As we observed in *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 47 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972):

> The hallmark of a tie-in is that it denies competitors free access to the tied product market, not because the party imposing the arrangement has a superior product in that market, but because of the power or leverage exerted by the tying product.

Competitors in the tied product market are injured if they cannot offer their products on an equal basis with the distributor of the tying product. *United States v. Loew's, Inc.*, 371 U.S. 38, 44–45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *Times-Picayune Publishing Co., supra*, 345 U.S. at 605, 73 S.Ct. 872. Buyers are injured because they forego choices among products and services, *see, e. g., Fortner I, supra*, 394 U.S. at 503–04, 89 S.Ct. 1252; *Northern Pacific Ry. Co., supra*, 356 U.S. at 6, 78 S.Ct. 514, and the public is harmed by the adverse effect on the market for the tied product.[4]

---

4. *See, e. g.*, Kauper, The "Warren Court" and the Antitrust Laws: Of Economics, Populism and Cynicism, 67 Mich.L.Rev. 325, 332 (1968); Turner, The Validity of Tying Arrangements under the Antitrust Laws, 72 Harv.L.Rev. 50 (1958).

The best statement of this rationale is Justice White's summary of the evils of tying arrangements.

There is general agreement . . . that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second. And even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, such tying agreements may work signif-

icant restraints on competition in the tied product. The tying seller may be working toward a monopoly position in the tied product and, even if he is not, the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter that market. They must be prepared not only to match existing sellers of the tied product in price and quality, but to offset the attraction of the tying product itself. Even if this is possible through simultaneous entry into production of the tying product, entry into both markets is significantly more expensive than simple entry into the tied market, and shifting buying habits in the tied product is considerably more cumbersome and less responsive to variations in competitive offers. In addition to these anticompetitive effects in the tied product, tying arrangements may be used to evade price control in the tying product through clandestine transfer of the profit to the tied product; they may be used as a counting device to effect price discrimination; and they may be used to force a full line of products on the customer

These reasons for the presumptive illegality of tie-ins have been questioned persuasively by commentators and economists. *See, e. g.*, Posner, Exclusionary Practices and the Antitrust Laws, 41 U.Chi.L.Rev. 506 (1974); Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L.J. 19 (1957). Underlying their criticism is the belief that enforcement and interpretation of the antitrust laws should be governed by economic principles for maximizing consumer welfare. The effect of this premise would be to shift our focus from the traditional interests in avoiding "coerced sacrifice[s] of alternatives" to an analysis of the tie-in's effect on economic efficiency. *Compare* Turner, The Validity of Tying Arrangements under the Antitrust Laws, 72 Harv.L.Rev. 50, 60 (1958), *with* Posner, *supra*, at 509.

From either vantage point, but particularly that of economic efficiency, the logic of some tie-in opinions leaves something to be desired. They have failed to recognize the importance of tie-ins as a means of price discrimination. *But cf. United States Steel Corp. v. Fortner Enterprises, Inc.,* —— U.S. ——, 97 S.Ct. 861, 51 L.Ed.2d 80 (Feb. 22, 1977) (Fortner II).

If the price for the tied item exceeds the price the purchaser otherwise would have to pay, absent the tying arrangement, then the purchaser will tend to regard this difference not as an increase in the price of the tied item, but rather as an increase in the price of the tying product. He is interested in the end price for the product or service—here, the total cost of burial. As a result, increases in the price of the installation service, for example, should decrease the demand for the tying product, the cemetery lot.[5] Only when the tying arrangement permits price discrimination does our traditional concern with the seller's economic position in the tied product market become realistic.

The clear implication from a purely economic standpoint is that tie-ins should be considered on a case-by-case basis because they are not inherently detrimental. They can in fact be beneficial.

The difficulty with adopting such an approach is well-recognized and it derives from the nature of courts and the costs of judicial enforcement. The problem stems from the unwillingness, if not the inability, of courts to undertake complex economic decision making in the face of economic indeterminacy and over-crowded court calendars.

As courts, we engage in our own balancing of notions about efficiency and have concluded that rules of presumptive illegality serve two vital functions. First, the *per se* rule:

> avoids the necessity for an incredibly complicated and prolonged economic investigation . . . in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless . . . .

*Northern Pacific Ry. Co., supra*, 356 U.S. at 5, 78 S.Ct. at 518.

Second, the Court's steadfast refusal to heed arguments premised solely on the theory of consumer welfare recognizes the fact that enforcement of the antitrust laws requires rules which are both predictable and workable. The test of presumptive illegality is such a mechanism. It protects competition "on the merits," *Northern Pacific Ry. Co., supra*, 356 U.S. at 6, 78 S.Ct. 514, by identifying situations which diminish equality of opportunity in competitive markets and proscribing them.

### B. *LEGAL STANDARDS.*

Appellants raise the tie-in issues under both § 1 of the Sherman Act and § 3 of the Clayton Act. Although the literal terms of

---

so as to extract more easily from him a monopoly return on one unique product in the line.

*Fortner, supra*, 394 U.S. at 512–514, 89 S.Ct. at 1262 (dissenting opinion, White, J.) (footnotes omitted).

**5.** Justice Holmes recognized the persuasiveness of this argument in 1917. *See Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 519–20, 37 S.Ct. 416, 61 L.Ed. 871 (1917) (dissenting opinion).

§ 3 refer to exclusive dealing contracts, the Supreme Court has extended its application to tying arrangements. *International Business Machines Corp. v. United States*, 293 U.S. 131, 135, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922).

 Under a § 3 theory, the plaintiff must establish that the effect of the tie-in "may be to substantially lessen competition." This standard is met either if the seller enjoys sufficient economic power in the tying product market to appreciably restrain competition in the tied product market or if a not insubstantial volume of commerce in the tied product market is restrained. The § 1 standard requires that both conditions be met. *Fortner I, supra* 394 U.S. at 499, 89 S.Ct. 1252, *quoting Northern Pacific Ry. Co., supra*, 356 U.S. at 6, 78 S.Ct. 514.

The practical difference between the two standards has eroded steadily since Justice Clark's attempt to draw a fine line of distinction in *Times-Picayune, supra*. This trend culminated in the opinion in *Fortner I, supra*, suggesting that the standards are virtually identical.

 To prevail on a § 3 theory, however, items must be "goods, wares, merchandise, machinery, supplies or other commodities." A better rule is that § 3 applies only if both the tying and tied items fit the definition. *See, e. g., Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29 at 32 (7th Cir. 1976); *Advance Business Systems and Supply Co. v. SCM Corp.*, 415 F.2d 55 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). The tie-ins involving the cemetery lots cannot satisfy this test. Therefore, our analysis proceeds on the basis of the § 1 test which mandates that both prongs of the *Fortner-Northern Pacific* standard be met.

1. The *Fortner-Northern Pacific* Standard.

 The first question under the *Fortner-Northern Pacific* test is: are there two separate and distinct products or services tied into a single package? Hypothetically one might ask whether the sale of the left shoe with the right shoe is an illegal tying arrangement. Such hypotheticals are useful because they demonstrate that the rules dealing harshly with tie-ins are designed not to prohibit the sale of "physically separable objects, but rather . . . [to prohibit] the use of a dominant desired product to compel the purchase of a second, distinct commodity." *Siegel, supra*, 448 F.2d at 47, *citing Times-Picayune, supra*, 345 U.S. at 614, 73 S.Ct. 872.

This inquiry was determinative in the *Times-Picayune* case where the Court dismissed the tie-in allegation because the requirement that advertisements be placed in both morning and afternoon newspapers under a single owner involved "products [which] are identical and the market the same." *Times-Picayune, supra*, 345 U.S. at 614, 73 S.Ct. at 883.

Dual markets have been crucial to the determination of other cases. For example, electric energy and the installation of underground conductors have been held to be a single product. In *Washington Gas Light Co. v. Virginia Electric and Power Co.*, 438 F.2d 248 (4th Cir.1971), the plaintiff, a gas company competitor of VEPCO, alleged that VEPCO's practice of providing builders with inexpensive underground service installations on condition that the builder erect a primarily electricity-served home was not an unlawful tie. The critical factor in the Fourth Circuit's opinion was its finding that a lack of two separate markets tended to show a single product. *Id.* at 253; *see also Times-Picayune, supra*, 345 U.S. at 614, 73 S.Ct. 872.

The Court, however, rejected United States Steel's contention that the only product sold was prefabricated homes and that the credit arrangement was merely the means by which was set the price for the homes. *Fortner I, supra*, 394 U.S. at 497, 89 S.Ct. 1252. The Court held that credit arrangements (the tying product) were distinct from the prefabricated homes (the tied

product) sold thereunder. *Id.* at 507, 89 S.Ct. 1252.

In *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545 (E.D.Pa.1960), *aff'd per curiam,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), the defendant corporation supplied a complex cable antenna television system which provided reception, amplification, and transmission to areas with poor reception from ordinary antennae. The company offered the various components only on a system basis, including installation. The court found the components and installation were separate products. *Jerrold, supra,* at 559.

In this circuit, we have looked carefully at the "function of the aggregation" in order to determine whether only a single product is sold. *Siegel, supra,* 448 F.2d at 48. In *Siegel* we observed that, unless there are such considerations as legitimate cost savings or products used as a unit with fixed proportions, the tied product generally is regarded as "generically" distinct. *Id.*

An analogy can be drawn between the facts before us and the sale of condominiums. The purchase of a condominium unit often is conditioned on the purchase of a management services contract for maintenance of the unit and common areas of the complex. These have been found to be distinct products and services for purposes of a tie-in analysis under § 1. *See, e.g., Miller v. Granados,* 529 F.2d 393 (5th Cir. 1976); *Jones v. 247 East Chestnut Properties,* 75–2 CCH Trade Reg.Rep. ¶ 60,491, at 67,160 (N.D.Ill.1974).

An application of the factors in *Fortner* I and our consideration of the "function of the aggregation" leads inescapably to the conclusion that separate products and services are involved in each of the tying arrangements before us.

The second question under the applicable test is: did the cemeteries have sufficient economic power in the tying product market to restrain appreciably competition in the tied product market? Appellants are not required to prove a monopoly or dominant economic power, *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), although proof that the seller occupies a dominant position in the market for the typing item satisfies the test. *International Business Machines Corp., supra,* 298 U.S. at 136, 56 S.Ct. 701 (81% of the market).

Our focus in determining economic power should be whether the seller has sufficient power to raise prices or impose onerous terms "that could not be expected in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product." *Fortner II, supra,* —— U.S., at ——, 97 S.Ct. at 867–868.

Market power in the tying product may also be shown by product uniqueness or desirability.[6] In *Northern Pacific* the tying product was a unique item, choice land. Purchasers of it were compelled to route items produced or manufactured thereon over the railway's tracks. The Court found sufficient economic power on the basis of the land's uniqueness and strategic location which prevented competitors from offering the distinctive product themselves. *Fortner I, supra,* 394 U.S., at 505 n.2, 89 S.Ct. 1252. A product or service is not unique merely because the seller is willing to accept greater risks or a lesser profit than its rivals. *Fortner II, supra,* —— U.S., at ——, 97 S.Ct. 861.

This case is more analogous to the finding of uniqueness and sufficient economic power in *Northern Pacific* than to the lack thereof in *Fortner II* because the tie-ins here cannot be explained as a form of price competition in the tied product market. *See, e.g., Fortner II, supra,* —— U.S., at ——, n.10, 97 S.Ct. 861.

Similarly, the desirability which results from patent or copyright protection

---

**6.** The rationale is that leverage sufficient to restrain the tied market follows from "the tying product's desirability to consumers or from the uniqueness of its attributes." *Loew's, supra,* 371 U.S. at 45, 83 S.Ct. at 102.

constitutes sufficient power for purposes of § 1.[7] *See, e.g., Loew's,* 371 U.S. at 45, 83 S.Ct. 97 (films); *see generally* Day, Exclusive Dealing, Tying and Reciprocity—A Reappraisal, 29 Ohio St.L.J. 539, 571 (1968).

Other possible indices of sufficient economic power include: a competitor's inability to offer equivalent products or services profitably, *Warringer Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (5th Cir.), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972); a noncompetitive higher price charged for the tied product,[8] *Fortner I, supra,* 394 U.S. at 504, 89 S.Ct. 1252; or the existence of substantial numbers of buyers accepting the tie-in terms. *Fortner I, supra,* 394 U.S. at 508, 89 S.Ct. 1252; *see also Advance Business Systems and Supply Co. v. SCM Corp.,* 415 F.2d 55 (4th Cir.1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

■ The third element that must be shown is that the amount of interstate commerce affected is "not insubstantial" which means not *de minimis.* The amount of commerce affected is not measured by reference to the size or scope of any market foreclosed by the tie. Rather, the controlling consideration is "whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis* is foreclosed to competitors." *Fortner I, supra,* 394 U.S. at 501, 89 S.Ct. at 1258. The relevant figure is the total volume of sales tied and not the portion of sales allocable to the plaintiff. *Id.* at 502, 89 S.Ct. 1252.

The "not insubstantial" test has been met by showing dollar volumes which total $60,-800, *Loew's, supra,* 371 U.S. at 49, 83 S.Ct. 97, and estimated sales of $86,376, *Detroit*

*City Dairy, Inc. v. Kowalski Sausage Co.,* 393 F.Supp. 453, 472 (E.D.Mich.1975).

### 2. Economic Interest in the Tied Product.

■ In examining a tie-in claim, several additional questions must be answered. The first determination is whether the seller of the tying product (the cemeteries) have an economic interest in the tied product. *See, e.g., Venzie Corp. v. United States Mineral Prod. Co., Inc.,* 521 F.2d 1309, 1317 (3rd Cir.1975). Clearly by conditioning the sale of cemetery lots on the buyer's use of the cemetery's installation and care service or purchase of a marker from the cemetery, the test is met. Those cemeteries adopting a purchase requirement "through" the cemetery also have the requisite economic interest because they received a commission or profit on monument sales. *See, e.g., Venzie, supra,* at 1317. The evidence reveals that mark-ups by the cemeteries on these sales were often as high as 350%.

### 3. Coercion.

A second requirement is that there must be some modicum of coercion shown. So long as "the buyer is free to take either product by itself there is no tying problem." *Northern Pacific Ry. Co., supra,* 356 U.S. at 6 n.4, 78 S.Ct. at 518 n.4. The classic example of coercion in a tying arrangement is the *Loew's* case, *supra,* where the sale of the rights to several desirable films was conditioned on the television network's purchase of undesirable ones.

■ Although some cases in other circuits have required a showing of actual

---

7. This position is consistent with the Court's early decision in patent tie-in cases. *See, e.g., Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.,* 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396 (1944); *Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917).

8. As Professor Turner observes, economic power with respect to the typing product:

is a near certainty when the seller both gets a profit on the tying product and sells the tied product at a noncompetitive price; and that the existence of such power is almost as certain when just the second feature, noncompetitive price on the tied product, exists, even though the tying product is sold or leased at nominal rates.

*Turner, supra,* 72 Harv.L.Rev. at 63.

coercion, *see, e.g., Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211 (3rd Cir. 1976); *cf. Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307 (5th Cir.1976) (hard selling not enough), our reading of the Supreme Court's opinions supports the view that coercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic power in the tying product market, *infra. See, e.g., Hill v. A-T-O, Inc.,* 535 F.2d 1349, 1355 (2d Cir. 1976). Coercion occurs when the buyer must accept the tied item and forego possibly desirable substitutes. *See, e.g., Northern Pacific Ry. Co., supra,* 356 U.S. at 5–6, 78 S.Ct. 514. *Cf. AAMCO Automatic Transmissions, Inc. v. Tayloe,* 407 F.Supp. 430, 435 (E.D.Pa.1976).

The fact that each purchaser of a cemetery lot was not absolutely required to buy a marker is an argument we rejected in *Siegel, supra.* There we refused to accept appellant's individual coercion theory and we were not troubled by the fact there was no evidence to show that each of the 650 franchisees had been required to purchase the equipment, mixes, and packaging. A showing of an onerous effect on an appreciable number of buyers coupled with a demonstration of sufficient economic power in the tying market is sufficient to demonstrate coercion.

## C. *JUSTIFICATIONS.*

In addition to their contention that only a single product is involved here, appellees offer several justifications for the tying arrangements. The first is essentially a goodwill and quality control argument. They maintain that the installation services and the purchase of markers from or through the cemeteries are necessary restrictions to retain neatness and aesthetic appearance.

The trial court found this argument particularly persuasive and commented:

> Requiring a customer to order a grave memorial through, as opposed to from, a cemetery is a reasonable restriction

. . . .. It is important that a cemetery be able to control to some extent the type and quality of memorial that is placed in that cemetery. Uniformity and quality of memorials add much to the beauty and appeal of a cemetery.

The trial judge also agreed with appellees' contention that quality control considerations made the installation service requirements reasonable:

> Uniformity and quality of installation of the memorials not only add to the beauty and appeal of the cemetery but also assist in the future care and maintenance of the cemetery. This rule is reasonable for the efficient operation of a cemetery and is not restraint of trade or commerce.

These comments overlook the Supreme Court's admonition that:

> The *only situation* . . . in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied.

*Standard Oil Co. of California v. United States,* 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949) (emphasis added).

We faced a similar problem in *Siegel, supra.* Appellants there argued that the agreement requiring franchisees to purchase equipment, mixes, and packaging from the franchisor was ancillary to the legitimate business purpose of protecting their good will through quality control. We rejected that argument because we found that quality control and good will could reasonably be maintained by specifications.

Appellees have offered no single reason why the Lane County cemeteries could not provide reasonable guidelines and specifications for the markers to be used and the practices to be followed during installation which would not diminish the appellees' concern for the need to maintain neat, attractive grounds. Quite simply, there are far less restrictive alternatives available than a tying arrangement to effect the cemeteries' legitimate goals.

▇▇▇▇ Appellees further raise a regulated industry defense. They contend that Oregon's regulatory powers over the management and care of its cemeteries provide a source of exemption from the presumptive illegality test on a rationale similar to that advanced in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Court recently held in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) that a regulated utility which tied the sale of its electricity and light bulbs under a state approved tariff could be liable for an antitrust violation.

As Justice Stevens observed in *Cantor,* arguments based on potentially inconsistent standards or conflicts between the state regulatory scheme and the federal antitrust laws are unavailing. *Id.,* at 596, 96 S.Ct. at 3120. We believe Congress did not intend that important federal interests underlying the antitrust laws should be subordinated to those of state regulatory programs, even if the resulting standards may be in conflict or inconsistent. *Id.*

### D. CONCLUSION.

In sum, we hold that the district court erred when it failed to apply the appropriate legal standards to the facts of this case on the tie-in claims. Moreover, it erred as a matter of law in recognizing the reasonableness of the tie-in restrictions. Accordingly, that portion of the district court's judgment must be vacated and the cause remanded for further consideration consistent herewith.

### II.

### MONOPOLIZATION

Moore contends that the appellees violated § 2 of the Sherman Act by monopolizing the market in grave memorials. But appellants failed to produce facts to prove such claims and did not demonstrate the necessary elements of a § 2 violation.

▇▇▇ The offense of monopolization under § 2 requires proof of two distinct elements:

(1) The possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.,* 497 F.2d 203, 209 (9th Cir.1974).

▇▇▇ To demonstrate the requisite degree of monopoly power the burden rests on the plaintiffs to delineate the relevant geographic and product markets and the market shares therein.

The relevant geographic market is the "area of effective competition" defined in terms of where buyers can turn for alternative sources of supply. *See Otter Tail Power v. United States,* 410 U.S. 366, 369 n.1, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Standard Oil Co. v. United States,* 337 U.S. 293, 299–300 n.5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

▇▇▇ The record reflects an absence of market data from which we can assess the relevant geographic market. Without it the court cannot determine whether the relevant geographic market should be Lane County, the state of Oregon, the Pacific Northwest or some other division.

Similarly, the record does not contain sufficient probative evidence to discern what constitutes the relevant product market. Although the record is replete with numerical figures of sales and marketing activities, it lacks the data and other material necessary to measure the degree of "functional interchangeability" between the products involved as to price, use, quality, and characteristics. *United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 399, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

Appellants failed to demonstrate the extent of cross-elasticity of demand in the market. Without such information, it is impossible to determine whether the relevant market is "all grave memorials" or two or more different product markets,

such as "bronze memorials," granite memorials," "flat bronze memorials," etc.

The inadequate showing of the prerequisites for recovery prevents the court from assessing the market shares in the relevant market. For instance, it is impossible to determine what share Matthews had in Lane County or in Oregon. The only evidence in the record related to the nationwide market in bronze markers.

Even in the absence of empirical proof of market shares (usually the best indicator of monopoly power), the requisite power also can be demonstrated by evidence of the exercise of actual control over prices or exclusion of competitors. *E. I. du Pont, supra,* 351 U.S. at 391, 76 S.Ct. 994. Appellants have failed to produce evidence along this line.

Their failure to provide the necessary factual showing defeats their attempt to prove a § 2 monopolization argument.[9] Because the ultimate conclusion of the district court on this point is correct, we need not determine whether the lower court relied upon a wrong ground or gave a wrong reason. *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937); *James v. Reese,* 546 F.2d 325 at 327 (9th Cir. 1976).

## III.

## ATTEMPT TO MONOPOLIZE

Appellants further argue that appellees violated the antitrust laws by attempting to monopolize the market in grave memorials through exclusionary or predatory conduct.[10] To prevail appellants must prove "a specific intent to destroy competition or build [a] monopoly . . ." *Times-Picayune, supra,* 345 U.S. at 626, 73 S.Ct. at 890; *Chisholm Brothers Farm*

9. Although we need not reach the issue here we observe that appellants also failed to demonstrate the necessary intent under a § 2 claim of monopolization.

10. *See generally* Cooper, Attempts and Monopolization: A Mildly Expansionary Answer to

*Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1144 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974). *See also Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

The rule in this circuit is that the necessary proof can be inferred from:

either specific intent coupled with monopoly power *or* from 'proof of specific intent to set prices or exclude competition accompanied by predatory conduct directed to accomplishing the unlawful purpose.'

*Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1205 (9th Cir. 1975), *quoting Hallmark Industry v. Reynolds Metal Co.,* 489 F.2d 8, 12–13 (9th Cir. 1973). *See also Knutson v. The Daily Review, Inc.,* 548 F.2d 795 at 814 (9th Cir. 1976).

Appellants' evidence failed to meet these standards. There was no evidence of specific intent as required under § 2 nor a showing of illegal or predatory activity from which specific intent could be inferred.

## IV.

## REFUSAL TO DEAL

The trial court properly found that there was no concerted refusal to deal by appellees:

The defendant cemeteries did not stop dealing with Moore at the same time or pursuant to any agreement or conspiracy. Some of the defendant cemeteries, in fact, are still willing to deal with him.

Appellants concede the correctness of the trial judge's finding that there was no horizontal refusal to deal and do not raise the conspiracy issue on appeal in any context.

the Prophylactic Riddle of Section 2, 72 Mich.L. Rev. 375 (1974); Note, Attempt to Monopolize Under the Sherman Act: Defendants Market Power as a Requisite to a Prima Facie Case, 73 Colum.L.Rev. 1452 (1973).

Consequently, none of the alleged vertical collective actions presents the type of prohibited practice found in *Eastern States Retail Lumber Dealers Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914) (horizontal combinations excluded direct competitors from the market); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (vertical combinations designed to exclude some direct competitors); or *Fashion Originators Guild of America v. Federal Trade Comm'n*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (a group of "original" designers refused to sell their creations to retailers who purchased and sold copies of the original designs).

The principle established in *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), that a businessman is allowed, absent a monopolistic purpose, to deal with any supplier or customer he or she chooses, retains its vitality. Mere refusal to deal, without an agreement or conspiracy, is not a violation of the antitrust laws. *Dahl, Inc. v. Roy Cooper Co., Inc.*, 448 F.2d 17 (9th Cir. 1971). Showing that appellees belonged to a trade association and attended the same conventions without more is not proof of a concerted refusal to deal. In the absence of a monopolistic purpose or sufficient evidence of an unlawful agreement among the cemeteries and Matthews, the trial court's determination should be affirmed.

## V.

### CONSPIRACY

None of the conspiracy claims raised below is before us on appeal. In the light of our affirmance of the district court's judgment with respect to the claims of monopolization, attempt to monopolize and concerted refusals to deal and the absence of any conspiracy issue, we direct the district court to dismiss Matthews as a party-defendant upon remand.

The judgments on appellants' tie-in claims are vacated and the case is remanded for further proceedings and factual determinations consistent with the standards articulated in this opinion. Each party will bear its own costs on this appeal.

VACATED AND REMANDED in part, AFFIRMED in part.