John BAZAL, Plaintiff,

v.

BELFORD TRUCKING CO., INC., a Florida Corporation, and Rentar Trailer and Container Leasing Co., a Florida Corporation, Defendants.

No. 77–6272–Civ–JLK.

United States District Court,
S. D. Florida.

Dec. 5, 1977.

**1092**

William S. Isenberg, North Miami, Fla., for plaintiff.

Craig B. Sherman, Bay Harbor Islands, Fla., for defendants.

## ORDER

JAMES LAWRENCE KING, District Judge.

This cause came on for consideration upon the motion of defendant to dismiss and, in the alternative, to strike certain portions of the complaint and upon the motion of defendant for a more definite statement. The court, having considered the record and being fully advised in the premises, finds and concludes that the motion to dismiss should be denied and that the motion to strike should be granted in part.

This case presents a novel question in antitrust law. The essence of plaintiff's claim is that the defendant corporations have violated the federal antitrust laws vis-a-vis the agreements entered into by the parties and, in addition, that the defendants are liable for breach of those agreements and for tortious conduct in connection with activities performed pursuant to the agreements.

There are three agreements at issue. The first provides that plaintiff will lease one of defendant Rentar's trucks. The second agreement, executed the same day as the first, allegedly provides that plaintiff "authorized" that he would operate the aforementioned truck exclusively in the service of defendant Belford. The third agreement, executed two days after the others, allegedly provides that plaintiff, as an independent contractor, would furnish defendant Belford, the carrier, the aforementioned truck for a period of thirty days.

The critical allegation for the purposes of this motion to dismiss appears in paragraph ten of the complaint. There, plaintiff alleges,

That prior to the execution of Plaintiff's Exhibits A, B and C herein [the three agreements], the Defendant Belford notified the Plaintiff that *in order to work for them, the Plaintiff must 'rent their truck'.* (emphasis added).

The question before this court on this motion to dismiss is whether the complaint, particularly paragraph ten, states a cause of action cognizable under the Sherman Act of the federal antitrust laws, 15 U.S.C. § 1. If this question is answered in the affirmative, then plaintiff's additional claims sounding in contract and tort may be arguably within the realm of pendent jurisdiction. If the question be answered in the negative, the suit, as a whole, cannot be pursued in its present posture in federal court.

## I. The Antitrust Claim:

### A. Background:

A tie-in arrangement, whereby the purchase of one product or service is mandatorily tied to the purchase of another product or service, is treated quite harshly under the federal antitrust laws. The cases striking down such arrangements are legion in number, stretching back in time over three decades. *See International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

█ Each case arising in this area carefully acknowledges its precedents. The elements which must be proven in order to establish an unlawful tie-in are therefore beyond dispute at this time. These elements have been presented clearly in the recent case of *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977).

In this case, plaintiff objected to the practice of defendants whereby cemetery lots could not be purchased unless the purchaser agreed to purchase a memorial from or through the cemetery. In addition, lot purchasers were required to utilize the cemetery's installation service.

The Ninth Circuit stated that tie-in arrangements

are *presumptively illegal* if certain elements exist and, once those are demonstrated, no specific showing of unreasonable anti-competitive effect is needed.

550 F.2d at 1211 (emphasis added).

The elements referred to were then enumerated by the court. First, plaintiff must demonstrate that there is "in fact . . . a tying arrangement between two distinct products or services." 550 F.2d at 1212. Defendants assert that there is no such arrangement in the present case. Instead, defendants claim that plaintiff has not established that two distinct products are involved.

The second element requires plaintiff to demonstrate that the defendant has "sufficient economic power in the tying market to impose significant restrictions in the tied product market." 550 F.2d at 1212. Defendant also challenges plaintiff's complaint as being insufficient with regard to this element. Clearly, this second element need not be considered until the presence of the first element is established.

The third element which plaintiff must establish is that the "amount of commerce in the tied product market must not be insubstantial." 550 F.2d at 1212. This too is the source of another challenge by defendant in its motion to dismiss.

This court will determine the sufficiency of the complaint as to each of these elements in turn below. However, as a preliminary matter, it is important to delineate the framework within which this court must operate in determining a motion to dismiss a claim when that claim is predicated upon the federal antitrust laws.

B. *Framework* :

█ The requisite specificity for pleadings in an antitrust suit was a popular subject of discussion in the years subsequent to the adoption of the Federal Rules. Professors Wright & Miller note that there is nothing in the Federal Rules, on their face, to suggest that a greater level of specificity is required with regard to such claims. 5 Wright & Miller *Federal Practice and Procedure: Civil* § 1228. Yet, initially,

several federal courts were inclined to require greater specificity due to concerns over the lengthy pre-trial aspects of antitrust claims; the potential for abuse in such suits; and "the inherent complexity of the issues involved . . . " Wright & Miller at 166.

Today, however,

As far as most federal courts are concerned, it now is reasonably clear that the standard in Rule 8(a) calling for a short and plain statement of the claim for relief is to be applied in the 'big case' in the same fashion as it is in any other action.

Wright & Miller, at 167.

*See Nagler v. Admiral Corporation,* 248 F.2d 319 (2d Cir. 1957).

█ Thus, because this court must apply the same standard of specificity to the claims in the case *sub judice* as it does in the other suits which come before it, it is guided herein by the principle delineated by the Supreme Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). There, with respect to the determination of a motion to dismiss, the Court stated:

in appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

With this principle in mind, this court turns its attention to a determination of the most complex issue before it—the question of whether plaintiff has sufficiently pleaded element one of a claim predicated upon an unlawful tie-in arrangement. That is, the court must determine whether there are, in fact, two distinct "products" involved herein.

C. *Element One: Two Distinct Products*

█ Plaintiff suggests that there is an unlawful tie between his contract of employment and the rental of a truck. The problem this presents is that these two "items" do not match the conventional

understanding of two "products" or "services." However, this court finds that both items are cognizable under the tie-in arrangement rubric. More specifically, this court finds that a contract of employment can fall within the category of a "tying product".

While there is no case law which expressly supports this position, prior cases have provided a foundation for it. These cases, arising under the principles of section one of the Sherman Act, free the terms "products" and "services" from their conventional moorings. This is critical because of the aforementioned need to establish that two "products" or "services" are tied together in order to satisfy the first prerequisite of proving a tie-in violation.

As early as 1964, the Second Circuit, in *Susser v. Carvel Corporation*, 332 F.2d 505 (2d Cir. 1964) was prepared to find that a *franchise contract* could be considered a tying product in an allegedly unlawful tying arrangement. Although the court did not explain this determination, it was significant for unlike prior tie-in cases, a less tangible item was involved. A franchise agreement is a contract and nothing more tangible than that. It is a "special privilege conferred . . . ." *Blacks Law Dictionary*, 4th Ed.

Before 1964, less tangible items were not considered as potential tying products. In *International Salt Co. v. United States*, the tying product was a salt dispensing machine and the tied product was salt. In *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) the products at issue were newspapers. Thus, the concept of a "privilege" as a tying or tied product was more than an inevitable occurrence given the case law preceding its development. *See*, for a general survey, D. Turner, "The Validity of Tying Arrangements Under the Antitrust Laws," 72 *Harv.L.Rev.* 50 (1958).

Noticeably, the courts which initiated the evolution tward less tangible product did not focus on this step as a departure from the norm. In fact, by 1971, such determinations seem to have become a matter beyond controversy. In *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), the Ninth Circuit treated the franchise contract of a restaurant as fully cognizable under the tie-in rubric. The precedent which the Ninth Circuit cited was, significantly, *Susser*. Time had supplied ample justification. Other circuits soon joined in this analysis. *See Carpa v. Ward Foods*, 536 F.2d 39 (5th Cir. 1976) and *Northern v. McGraw-Edison Co.*, 542 F.2d 1336 (8th Cir. 1976).

While the development of a franchise contract as an eligible tying product proceeded apace, the Supreme Court rendered an equally important decision concerning "credit" as an item which could not be unlawfully tied with another product. In the landmark case of *Fortner Enterprise, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), money, in the form of potential loans, was the primary subject under investigation.

In *Fortner*, the Court determined that defendants had arranged an illegal tie-in between "credit" and the purchase of prefabricated houses, manufactured by United States Steel. The Supreme Court explained:

> The Credit Corp. sold its credit only on the condition that petitioner purchase a certain ¯number of prefabricated houses from the Homes Division of U. S. Steel. Our cases have made clear that, at least when certain prerequisites are met, arrangements of this kind are illegal in and of themselves, and no specific showing of unreasonable competitive effect is required.

*Fortner*, at 1256.

"Credit", like the privilege embodied in a "franchise", is somewhat less tangible than a conventional product or service. However, both now are firmly entrenched as potential "tying products" as can be seen in the Fifth Circuit's opinion in the recent case, *Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation*, 549 F.2d 368 (5th Cir. 1977).

*Kentucky Fried Chicken* involved a claim by a fast food franchisor that the franchise

agreements under which it was required to operate were violative of the Sherman Act. These agreements provided that a franchise had to purchase supplies such as napkins, carry-out boxes and towelettes from sources *approved* by the franchisor in order to receive a franchise. The Fifth Circuit began its opinion by noting that plaintiff, in a tie-in suit, must demonstrate that "two separate products are involved." The court then briefly engaged in the inquiry with which this court is currently involved—whether two separate products were present. In almost summary fashion, the Fifth Circuit noted that "tying principles are fully applicable to franchise sales." *Kentucky Fried Chicken Corp.*, at 376. As the court explained, prior case law compelled the conclusion that

> when a franchisor conditions the sale of a franchise on the buyer's agreement to buy additional products from the franchisor, the law of tying comes into play.

*Kentucky Fried Chicken Corp.*, at 376.

For present purposes, the precedent provided by the above cases opens the door but does not transport this court to its ultimate conclusion. To travel that distance, this court finds that it ultimately must rely on inference.

Unlike the franchise or credit cases, the alleged tying product in the case *sub judice* —an employment contract—is not the primary product of the defendant corporation. For the franchisor, the sale of a franchise contract is its raison d'etre. Likewise with regard to credit and the credit corporation. In the case *sub judice*, however, trucking is the defendant's primary concern. Thus, this court must inquire as to whether the "product" of an employment contract can be treated as a "tying product"—notwithstanding that it is not the defendant's primary product.

This court answers this question in the affirmative. First, prior tie-in cases of a more conventional posture have struck down tie-in arrangements when the tying product was not necessarily the defendant's primary commercial concern. In *Fortner*, supra, the tying product was loans furnished by a subsidiary of defendant United States Steel, a corporation more deeply involved in the production of steel than in lending money. Second, and of greater importance in arriving at a resolution to this problem, is the presence of two recent cases which almost take the final step toward the recognition of an employment contract as a tying product.

The first of these cases is *Hill v. A–T–O*, 535 F.2d 1349 (2d Cir. 1976). In *Hill*, a class action was filed on behalf of those persons who found that they could not obtain membership in a particular buying service unless they purchased a particular product. The court summarized as follows:

> in the present case appellants have made a showing sufficient to entitle them to attempt to prove their allegations of illegal tie-in at trial. There is an admitted tie between two clearly separate products. It is undisputed that the only way that *membership* in the FBP buying service could be obtained in the New York metropolitan region was through the purchase of the Compact vacuum cleaner. The Compact defendants held the exclusive franchise to sell the membership certificates in this area and admit they did so only in conjunction with vacuum cleaner sales.

*Hill*, at 1353–54 (emphasis added).

The tying product in *Hill* was a *membership certificate* entitling the holder to the *privileges* of a buying service. Two aspects of this are noteworthy. First, the certificate was clearly not the primary product of the defendant corporation. Second, the tying product was the intangible item called "membership" embodied in a paper certificate and attended by certain perquisites. Like the employment contract in the case *sub judice*, the tying product at issue in *Hill* was one step more removed from the conventional concept of a tangible tying product.

Reinforcing this perspective is the second of the two cases referred to above—*Miller v. Granados*, 529 F.2d 393 (5th Cir. 1976). Here, individual condominium owners alleged, *inter alia*, that defendants had violat-

ed the Sherman Act by supporting an illegal tie-in arrangement. The Unit Owner plaintiffs contended that the purchase of the condominiums was conditioned on the acceptance of a management contract "under which the manager provides all services, properties and administration for the complex . . . " *Miller* at 396. The tie-in, plaintiffs claimed, was predicated upon the signing of the "Operational Management Agreement"—a prerequisite to ownership of the condominiums at issue.

*Miller* is quite important for present purposes. The "management agreement" at issue therein is perhaps the item most closely related to the employment contract "product" at issue in the case *sub judice*. Thus, the Fifth Circuit's finding as to the existence of a tie-in agreement in *Miller* is highly instructive as to whether a tie-in exists in the case presently before this court.

The *Miller* court depicted the predicate underlying plaintiffs' claim as,

a tie-in agreement of two products, (1) the condominium unit, the purchase of which is mandatorily tied in to (2) the *agreement* [the management service contract].

*Miller*, at 396 (emphasis added).

Defendant's response there, much like defendant's response in the case *sub judice*, was that the controversial sale only entailed the purchase of *one* product—that is, that the management services supplied were an integral part of the purchase of a condominium, much like the left shoe is to the right. While the court held that defendant's response was untimely since it had not been raised at trial, it nevertheless concluded that Count I of the complaint—the count asserting tie-in violations—"alleges all of the elements of a tie-in arrangement." Thus, it appears that the court concluded that the condominium purchase and the acceptance of a management employment contract were two separate tie-in "products" since such a finding would be a prerequisite to a finding that "all of the elements of a tie-in arrangement" exist. See, *Moore*, supra.

*Miller* is therefore a crucial development in the concept of an "employment contract" as a potential tying product. This court finds, on the basis of *Miller* and the other cases discussed above, that allegation of the employment contract as a tying product in the case *sub judice* is proper.[1]

Whether or not there is an illegal tie between two separate products in the case *sub judice* is a question which this court need not determine at this stage of the proceedings. As was stated earlier, this court need only decide here that it is not "beyond doubt that the plaintiff can prove no set of facts in support of his claim . . . " *Conley*, 355 U.S. at 46, 78 S.Ct. at 102. Having decided, as a matter of law, that an employment contract is a potential "product" as that term is used for purposes of Sherman Act tie-in disputes, this court finds that plaintiff has asserted sufficient facts to enable him to withstand a motion to dismiss—at least as to the first element which must be pleaded in such a suit (i. e. that two separate products exist).

The court now turns its attention to a consideration of whether plaintiff has met his burden with regard to elements two and three, as stated in *Moore*, supra.

D. *Element Two: Market Power in the Tying Market*

 The second element of a tie-in suit centers on the question of whether defendant has "sufficient economic power in the tying market to impose significant restrictions in the tied product market." *Moore*, 550 F.2d at 1212. In paragraph twenty-seven of the complaint, plaintiff asserts that defendant possesses sufficient economic power in the truck rental market, along

---

1. This court notes, in passing, that *Times-Picayune*, a case cited by defendants in support of their position, is clearly distinguishable. There, plaintiff alleged that defendant would not permit him to advertise in the morning newspaper unless he also advertised in the afternoon paper. In the case *sub judice* two distinguishable products are involved—a service contract and a truck rental.

with the trucking and shipping markets, to coerce the leasing of the truck and the execution of the agreements at issue.

The Supreme Court's interpretation of this requirement in *Fortner* is quite helpful.

> The standard of sufficient economic power does not, as the District Court held, require that the defendant have a monopoly or even a dominant position throughout for the tying product. Our tie-in cases have made unmistakably clear that the *economic power* over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. . . . 'Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.'

*Fortner*, supra, 394 U.S. at 502, 89 S.Ct. at 1258. (cit. omit.)

Thus, even though defendant is probably correct in its belief that the trucking industry is comprised of a vast number of companies, this, in and of itself, is not dispositive of the issue of "sufficient market power" at the juncture of this motion to dismiss.

The attitude of this court herein is perhaps most clearly captured in the Supreme Court's opinion in *Poller v. Columbia Broadcasting*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). There, within the Sherman Act context, the Court stated that,

> We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.

*Poller*, at 473, 82 S.Ct. at 491.

The allegations within the complaint are sufficient to withstand a motion to dismiss as to element two.

## E. Element Three: Amount of Commerce Affected

■ The third element which must be demonstrated by plaintiff in order to succeed in a tie-in suit is that "the amount of commerce in the tied product market must *not be insubstantial*." *Moore*, 550 F.2d at 1212 (emphasis added). Note that "not insubstantial" does not equate with "substantial". As the *Fortner* Court explained,

> The requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie . . . . [N]ormally, the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie.

*Fortner*, 394 U.S. at 501, 89 S.Ct. at 1257–1258.

The Ninth Circuit has further explicated this third element as follows: the important determination in this regard, is "the total volume of sales tied and not the portion of sales allocable to the plaintiff." *Moore*, at 1216.

Plaintiff has asserted that a not insubstantial amount of commerce in the tied product market is affected by the allegedly unlawful arrangement at issue. Defendant's objections to this assertion are phrased in general terms. It is not the purpose of this court at this time to determine whether the total business affected exceeds the *de minimis* level. Given the liberal concept of pleading embodied in the Federal Rules of Civil Procedure and given that this court cannot find that it is beyond doubt that plaintiff will not come forward with a set of facts supportive of his claim, the complaint will be deemed sufficient to overcome the present motion to dismiss.

The court's perspective in this series of determinations is shaped, in part, by the principle enunciated by the Supreme Court in *Fortner*:

> where [tying] conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying' arrangements serve hardly any purpose beyond the suppression of competition. They deny com-

petitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market.

*Fortner,* supra, 394 U.S. at 498–99, 89 S.Ct. at 1256 (cit. omit.)

Having determined that the motion to dismiss should be denied, this court now turns to a consideration of defendant's motion to strike.

## II. *Motion to Strike*

Defendant has offered several objections to plaintiff's complaint. This court will treat each objection in turn below.

### A. *Objection One: Two Causes of Action in One Count*

Defendant contends herein that plaintiff has violated Rule 10(b) of the Federal Rules of Civil Procedure by failing to separate two causes of action into separate counts. The court finds that the complaint is consistent with Rule 10(b).

Rule 10(b) states, *inter alia,* that
[e]ach claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . *whenever a separation facilitates* the clear presentation of the matters set forth. (emphasis added).

This court has carefully scrutinized the allegations which comprise Count One of the complaint. It appears that the primary claim asserted therein sounds in breach of contract. There is, however, a secondary claim sounding in tort which is supported by plaintiff's allegations. This tort claim arises from the very same actions which allegedly constitute the breach of contract.

■■ Plaintiff does not identify whether his claim sounds in contract or tort. Yet it appears that both claims are present given the fact that plaintiff has asserted a prayer for exemplary damages. Such damages are not generally recoverable for breach of contract but are recoverable for the tort which arises when the breach is comprised of malicious or wanton conduct (see the discussion under II–E, infra). Thus, the allegations comprising Count I of the complaint state a contract claim and a tort claim, the latter being an outgrowth of the former. While there thus would be two different causes of action stated in Count One, Rule 10(b) would not mandate their separation into two independent counts because the circumstances underlying both claims are similar, if not identical.

The requirement of separate counts under Rule 10(b) is discretionary, as can be seen from the Rule's provisions. Professors Wright and Miller note that despite the express language of this Rule requiring more than one transaction to be involved before separate counts will be deemed necessary, most federal courts have required separation when such requirement will serve to clarify a party's claims. 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1324. However, in the case *sub judice,* this court deems separation to be unnecessary. It is clear that only one series of transactions underlies the contract and intentional tort claims asserted in Count I.

The Second Circuit had occasion to treat this problem in *Original Ballet Russe Ltd. v. Ballet Theater, Inc.,* 133 F.2d 187 (2d Cir. 1943). There, the court was confronted with a complaint which asserted that defendants had conspired to ruin plaintiff's business and that defendants had committed several tortious acts in furtherance of the conspiracy.

In its consideration of the effect to be given Rule 10(b), the Second Circuit noted that the fact that plaintiff charged defendants with accomplishing the harm by acts which themselves could be deemed independent torts "does not necessarily mean that he had alleged several causes of action which must be stated in separate counts." *Original Ballet Russe,* at 189. In support of this conclusion, the Second Circuit referred to an earlier decision by a Michigan state court—*Oliver v. Perkins,* 92 Mich. 304, 52 N.W. 609. In *Oliver,* plaintiff alleged a series of acts which defendants classified as constituting "breach of contract, trespass,

and a slander." *Original Ballet Russe*, 133 F.2d at 189. The *Oliver* court held that this series of wrongful acts were all aimed at a single result and could "be counted upon, not severally but collectively, as producing that result, in an action on the case." Quoted in *Original Ballet Russe*, 133 F.2d 189–90. Therefore, separation into independent counts was unnecessary.

Upon the analysis contained in *Oliver* and its own assessment of the claim before it, the Second Circuit, in *Original Ballet Russe*, concluded that

> The complaints at bar do not treat the defendants' acts as separate transactions or occurrences, nor ask for separate judgment against the defendant charged with doing a particular act. All the acts are alleged to be connected by the common purpose and directed to the common end of driving the plaintiff from the theatrical world. We do not think that a separation into counts is necessary to facilitate 'the clear presentation of the matters set forth.'

133 F.2d 190.

For the reasons stated above and upon the above authority, this court finds that Count I of plaintiff's complaint is consistent with the language and spirit of Rule 10(b).

### B. *Objection Two: Pendent Jurisdiction*

There are essentially three claims in the case before this court. One arises under the federal antitrust laws while the other two—one sounding in tort, the other in contract—are connected with an alleged breach of contract. The tort claim as discussed above, is an outgrowth of the contract claim. Further, the contract which plaintiff alleges that defendants breached serves as the focus of the antitrust allegations.

This court believes that pendent jurisdiction is clearly appropriate in these circumstances. According to the Supreme Court, the test for the appropriateness of such jurisdiction is as follows:

> The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

██ Pendent jurisdiction is proper where the federal claim entails violations of the Sherman Act and the state claim revolves around a contract integral to the Sherman Act claim. *See, Gem Corrugated Box Corporation v. National Kraft Container Corporation*, 427 F.2d 499 (2d Cir. 1970).

In *Gem*, the original complaint contained two causes of action asserting violations of the antitrust law and one cause of action asserting a breach of contract. The Second Circuit concluded that pendent jurisdiction should be exercised with regard to the contract claim. In fact, the court reached this conclusion even though the antitrust claim—to which the contract claim was appended—had been dismissed *prior* to trial. *See*, also, *Sims v. Western Steel Company*, 403 F.Supp. 450 (D.Utah 1975).

Finally, it should be noted that the Fifth Circuit has been quite vigorous in its support of pendent jurisdiction when such jurisdiction is appropriate. In *Brunswick v. Regent*, 463 F.2d 1205 (5th Cir. 1972), the Fifth Circuit affirmed the trial court's decision to maintain pendent jurisdiction over a contract claim when the federal securities claims asserted along with it were withdrawn prior to trial. The *Brunswick* court noted that

> the district court was not only empowered, but *compelled* to retain pendent jurisdiction of the contract claim. As a judicial economizer, pendent jurisdiction permits transactional unity to serve as an entry visa to the federal enclave and merits our approbation.

*Brunswick*, 463 F.2d at 1207 (emphasis added)

In support of this conclusion, the Fifth Circuit cited *Gem Corrugated*.

██ This court acknowledges that the justification for pendent jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants . . ."

*Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. That justification resides within the claims presented herein. Therefore, defendant's second objection is denied.

### C. Objection Three: Recovery for Emotional Distress

In this objection, defendant contends that there is no recovery at law for emotional distress relating to a cause of action sounding in breach of contract. This court disagrees with this contention.

■■ Because plaintiff's contract claim is grounded in state law, state law governs the issue of damages recoverable thereunder. Under Florida law, damages for emotional distress are potentially recoverable in breach of contract situations although such situations are limited in number.

> Damages for mental anguish are not generally recoverable in actions for breach of contract. However, mental anguish may be a proper element of damages in such actions, where it may reasonably be held to have been within the contemplation of the parties, as a probable result of the breach, at the time of entering into the contract.

9A Fla.Jur. *Damages* § 92.

Thus, defendant's basic contention is incorrect since such damages are potentially recoverable in contract actions. However, because damages for emotional distress are within the category of "special damages", their assertion herein must be examined from an additional perspective. *See* 9A Fla.Jur. *Damages* § 10.

■ Under Florida law,

> special or consequential damages—that is, damages which do not necessarily result from the injury complained of or which the law does not imply as the result of that injury—must be particularly specified in the plaintiff's pleading.

9 Fla.Jur. *Damages* § 135.

This requirement has been construed by the Florida courts to mean that a claim for special damages is sufficiently pleaded to withstand a motion to strike if it "notif[ies]

the defendant of the nature of the special damages claimed." *Augustine v. Southern Bell Telephone & Telegraph Co.,* 91 So.2d 320, 323 (Fla.1956). *See also, Arcade Steam Laundry v. Bass,* 159 So.2d 915 (2d D.C.A. 1964).

■ Plaintiff, in the case *sub judice,* has alleged that he seeks recovery for emotional distress suffered. The facts underlying the claim have been stated in the complaint although plaintiff has not alleged the details of the emotional distress. At this stage of the proceedings, this court finds that plaintiff's allegations are sufficient to alert defendants to the nature of the special damages claimed—that "nature" being "emotional distress."

Therefore, this objection of defendants also is denied.

### D. Objection Four: Willful & Malicious Conduct by a Corporation

Here, defendant argues that there is no recovery in fact or in law for a cause of action sounding in contract and predicated upon willful, malicious, intentional and/or wanton conduct. Secondly, defendant argues that even if such recovery exists, a corporation cannot be adjudged to have committed acts of this nature.

■ This court treats the former contention first. Plaintiff states, in paragraph twenty-three of the complaint, that "[t]he actions of the defendants Belford and Rentar as described herein were willful, malicious, intentional and wanton." It is important to note that immediately following this paragraph is a prayer for relief which includes, in part, a claim for punitive damages. Florida law states that in order to provide recovery for exemplary or punitive damages, the wrongful act complained of must be characterized by "some circumstance of aggravation, such as willfulness, wantonness [or] maliciousness." 9A Fla. Jur. *Damages* § 126 and cases cited therein. Further, it should be noted that paragraph twenty-three is not asserted in support of the cause of action sounding in contract.

■ Thus, it appears to this court that the allegations comprising paragraph twenty-three were not directed at the claim for breach of contract, *per se*, but were instead directed at the tort claim which itself was premised on a willful and/or wanton breach of contract—conduct for which punitive damages are recoverable.

■ As to defendant's second contention, this court finds that there is merit therein. It is true that a corporation, *per se*, cannot be adjudged to have committed a willful act. Further:

> the courts of today hold . . . that in a proper case, for example, where the act is in the scope of the servant's employment or where it is a breach of some duty owed by the corporation to the injured person, recovery may be had against a corporation for not only an act of its agent or servant which was intentional and willful but even where the act complained of was malicious as well.

10 *Fletcher Cyc. Corp.* § 4882 (1970). Thus, the plaintiff can recover against a corporation for willful acts but those acts must have been performed by someone acting under its authority.

No human party has been designated by plaintiff as having committed the alleged "willful" acts. Plaintiff has alleged, instead, that such acts were committed by the corporation. Therefore, the court, *sua sponte*, orders plaintiff to amend his complaint to conform to the law on this subject or suffer this allegation to be stricken.

### E. *Objection Five: Punitive Damages*

The essence of this objection is that there is no basis in fact or law for a recovery of punitive damages in a breach of contract action. This court concludes that defendant is only partially correct in this regard.

■ Under Florida law, the *general* rule is that damages for breach of contract are limited to the pecuniary loss sustained, thereby excluding recovery for punitive damages. However, this rule does not obtain

in those exceptional cases where the breach amounts to an independent, willful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression. In such a case, the recovery must be based upon an intentional wrong, insult, abuse, or gross negligence, which amounts to an independent tort.

9A Fla.Jur. *Damages* § 124. *See, also, Country Club of Miami Corp. v. McDaniel,* 310 So.2d 436 (3rd D.C.A. 1975).

Thus, defendant is correct insofar as Florida law does not provide for recovery of punitive damages for breach of contract, *per se*. However, as discussed above with regard to objections numbers one and four, the actions which constitute the breach may be sufficiently severe, at times, to constitute an independent tort for which punitive damages *are* recoverable.

For the reasons stated earlier, it appears to this court that plaintiff has alleged facts sufficient to provide a basis for recovery of punitive damages in the case *sub judice*.

### III. *Motion for a More Definite Statement*

Finally, defendant contends that the damages for which plaintiff seeks recovery are too ambiguously stated to enable defendant to construct a response. The court finds otherwise.

According to Professors Wright and Miller,

> if a party is able to discharge his pleading obligations under the Rules, a Rule 12(e) motion based on the belief that a better affirmative pleading will enable him to provide a more enlightening or accurate response will be denied. 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1377.

■ This court notes that motions for a more definite statement are *disfavored* in the federal system. *See, Mitchell v. E–Z Way Towers, Inc.,* 269 F.2d 126 (5th Cir. 1959) and *United States v. Georgia Power Co.,* 301 F.Supp. 538 (N.D.Ga.1969). In the present case, defendant seeks to frame responsive pleadings to the allegations of damages asserted in the complaint.

The purpose of pleading under the Federal Rules is to give *notice* rather than to provide those details of the issues and evidence which would eventuate at trial. The latter objective is pursued through discovery. Judge Weinstein has commented, in response to a motion for a more definite statement concerning a claim of special damages, that

> [t]he tendency under the Federal Rules is to discourage motions to compel more definite complaints and to encourage the use of discovery procedures to apprise the parties of the basis for the claims made in the pleadings. . . . 'Particularization of the issues is indeed the first order of business. But the rules do not contemplate their definition by paper pleadings.'

*Stromillo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 54 F.R.D. 396, 397–98 (E.D.N.Y.1971).

It should be noted, in passing, that defendants have no pleading obligations with regard to a special damage claim. Failure to deny an assertion of special damages in a complaint does not constitute an admission. *See*, 5 Wright & Miller, *Federal Practice and Procedure: Civil*, § 1279 and *Vevelstad v. Flynn*, 16 Alaska 83, 230 F.2d 695 (9th Cir. 1956).

This court adheres to the spirit of the Federal Rules elucidated above. Therefore, it is

ORDERED and ADJUDGED that the motion to dismiss and the motion for a more definite statement be and the same are hereby denied. It is further

ORDERED and ADJUDGED that the motion to strike is granted in part and that plaintiff must amend his complaint pursuant thereto within ten days to state which party within the corporation was responsible for the willful and/or wanton conduct alleged in the complaint or suffer the same to be stricken.

DONE and ORDERED in chambers at the United States District Courthouse, Miami, Florida, this 15th day of December, 1977.