CARL SANDBURG VILLAGE CONDO-
MINIUM ASSOCIATION NO. 1,
et al., Plaintiffs,

v.

FIRST CONDOMINIUM DEVELOP-
MENT CO., et al., Defendants.

No. 82 C 5726.

United States District Court,
N.D. Illinois, E.D.

July 22, 1983.
On Motion to Alter or Amend
March 9, 1984.

Robert M. Dell, Reuben L. Hedlund, Sean F. O'Shea, Latham & Watkins, Hedlund, Hunter & Lynch, Chicago, Ill., for plaintiffs.

Howard Kane, Donald R. Harris, Richard J. Gray, Michael A. Weinbaum, Jenner & Block, Chicago, Ill., for defendants First Condominium Development Co. and Eagle II.

Arlene C. Erlebacher, Sara J. Gourley, Frederick J. Artwick, Jack Guthman, Sidley & Austin, Chicago, Ill., for defendants Arthur Rubloff & Co. and Robert D. Goodsitt.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This lawsuit arises out of the condominium conversion of Carl Sandburg Village, a

residential complex in Chicago. The plaintiffs are condominium associations and unit owners at Carl Sandburg Village. The defendants played various roles in the conversion.[1]

Plaintiffs' complaint includes one count charging a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and eight counts brought under state-law theories. Presently before the court are defendants' motions to dismiss the complaint.[2] For the reasons stated below, the court grants defendants' motions. Count I is dismissed with prejudice for failure to state a claim. The remaining counts are dismissed without prejudice for want of subject-matter jurisdiction.

The allegations of Count I are taken as true for purposes of defendants' motions to dismiss under Rule 12(b)(6), Fed.R.Civ.P. Among plaintiffs' allegations are the following. Carl Sandburg Village was developed as a complex of rental apartments in 1965, by entities owned or controlled by Arthur Rubloff, who is not a party to this lawsuit. Defendant Arthur Rubloff & Co., then owned or controlled by Mr. Rubloff, managed Carl Sandburg Village from its original development through 1981. Defendant Goodsitt was and is an officer of Arthur Rubloff & Co. In 1979 and 1980, Carl Sandburg Village was converted into a condominium complex. Shortly before this conversion, defendant Eagle II purchased the complex. Defendant First Condominium Development Co. carried out the conversion as agent for Eagle II. (Eagle II and First Condominium will be referred to as "the developer defendants.")

Plaintiffs allege that the developer defendants and Arthur Rubloff & Co. had "significant economic power" with respect to the sale of Carl Sandburg Village, and that they "engaged in an unlawful contract, combination and conspiracy to restrain interstate trade in the provision of building management services and condominium sales in violation of Section 1 of the Sherman Act." (Complaint, ¶ 18.) Plaintiffs allege also that "[t]he aforesaid contract, combination and conspiracy to restrain trade has consisted of an agreement among the defendants, an essential term of which has been illegally to tie the sale of the distinct product of management services provided by defendant Arthur Rubloff & Co. to the sale of the distinct product of condominium units in the Buildings [of Carl Sandburg Village] and thereby to refuse to sell the condominium units without the corresponding sale of management services." (Complaint, ¶ 19.)

The complaint goes on to allege in great detail that Arthur Rubloff & Co. failed to expose many physical defects in Carl Sandburg Village, allowing the developer defendants to sell units quickly, at artificially inflated prices, without making necessary repairs. (Complaint, ¶ 20.) The complaint alleges also that plaintiffs were required to pay higher fees to Arthur Rubloff & Co. than they would have paid had the management service contract been awarded in a free and competitive market; similarly, it is alleged that the services provided by Arthur Rubloff & Co. were less competent than those plaintiffs would have received had the management service contract been awarded in a free and competitive market. (Complaint, ¶ 21(a).) It is alleged further that "[c]ompetition in the sale of building management services and condominium units has been restrained in a not insubstantial amount of commerce." (Complaint, ¶ 21(b).)

The parties' memoranda on these motions give a more complete picture of the alleged tying arrangement, but the court is limited to an examination of the complaint when determining the sufficiency of plaintiffs' claim. Defendants have challenged

---

**1.** The unit-owner plaintiffs seek to represent plaintiff classes. Additionally, plaintiffs seek certification of a defendant class consisting of partners and beneficial owners of defendant Eagle II.

**2.** Certain defendants moved in the alternative to dismiss or for summary judgment. On February 8, 1983 the court directed the plaintiffs to respond to this motion only as to a motion to dismiss.

the complaint on several grounds, but the court will discuss only one argument, expressing no opinion as to the merit of defendants' other arguments.[3]

Defendants advance the argument that no tying claim is stated, since the developer defendants, who sell the tying product (condominium units), are not alleged to have a sufficient economic interest in sales of the tied product (management services). Plaintiffs do not dispute that such allegations are essential to a tying claim. Instead, plaintiffs argue that their complaint does include the necessary allegations. Specifically, plaintiffs point to their allegations that Arthur Rubloff & Co., by not disclosing several defects in Carl Sandburg Village, allowed the developer defendants to sell condominium units quickly, at artificially inflated prices, without making necessary repairs. This economic benefit to the developer defendants, plaintiffs argue, constitutes an economic interest in the sale of management services sufficient to support a tying claim.

This question—whether the seller of the tying product has a sufficient interest in sales of the tied product—is not a genuine issue in most tying cases. In the classic tying situation the seller of the tying product also is the seller of the tied product. *E.g., United States v. Loew's, Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). Frequently, the seller of one product is a subsidiary or affiliate of the seller of the other product. *E.g., Fortner Enterprises, Inc. v. U.S. Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Northern Pacific Ry. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).[4]

Apart from cases in which the two products are sold by one seller (or by affiliated sellers), illegal tying also has been found where the seller of the tying product receives a commission or rebate on sales of the tied product. *E.g., Ohio-Sealy Mattress Mfg. v. Sealy, Inc.,* 585 F.2d 821 (7th Cir.1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1216 (9th Cir.1977); *Falls Church Bratwursthaus, Inc. v. Bratwursthaus Mgmt. Corp.,* 354 F.Supp. 1237 (E.D.Va.1973). In the absence of such payments courts have rejected tying claims, even where—as generally is the case—the seller of the tying product receives some identifiable economic benefit from the challenged arrangement. *Keener v. Sizzler Family Steak Houses,* 597 F.2d 453 (5th Cir.1979), *aff'g in part* [1977] 2 Trade Cas. (CCH) ¶ 61,682 (N.D. Tex.1977); *Venzie Corp. v. United States Mineral Products Co.,* 521 F.2d 1309 (3d Cir.1975); *Crawford Transport Co. v. Chrysler Corp.,* 338 F.2d 934 (6th Cir. 1964), *cert. denied,* 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971 (1965); *Robert's Waikiki U-Drive v. Budget Rent-A-Car,* 491 F.Supp. 1199 (D.Haw.1980); *Rodrigue v. Chrysler Corp.,* 421 F.Supp. 903 (E.D. La.1976).

In this case plaintiffs allege that Arthur Rubloff & Co. conferred an economic benefit upon the developer defendants by concealing defects in Carl Sandburg Village, thereby allowing the developer defendants to sell condominium units quickly and at inflated prices, without making necessary repairs. Plaintiffs analogize this alleged economic benefit to the payment of a kickback, rebate or commission, but the cases rejecting tying claims make it clear that other types of economic benefits are not automatically to be equated with commissions. After considering plaintiffs' allegations, the parties' arguments and the

---

**3.** One of defendants' arguments for dismissal is based on the theory that the condominium units and the management services are a single product. This issue presently is being considered by the Court of Appeals for this Circuit in *Johnson v. Nationwide Industries, Inc.,* No. 81–1347 (7th Cir. argued Sept. 24, 1981) [715 F.2d 1233]. Rather than anticipate the decision of the Court of Appeals, or wait for it, the court decides the present case on a different issue which is not present in *Johnson.*

**4.** Plaintiffs drafted their complaint in a way that emphasizes connections between Arthur Rubloff & Co. and the original developers of Carl Sandburg Village, but on this motion they do not argue that the tying and tied products should be deemed to be sold by affiliated entities.

case law, the court concludes that plaintiffs do not allege the requisite interest, on the part of the developer defendants, in the sale of management services.

The court will address several points raised in plaintiffs' memoranda. First, plaintiffs rely on the statement by the Court of Appeals in the *Sealy* case, that "there is no illegal tying arrangement where a 'tying' company has absolutely no financial interest in the sales of a third company whose products are favored by the tie-in." 585 F.2d at 835. (Plaintiffs' Memo in Opposition, p. 18.) Stressing the passage "absolutely no financial interest," plaintiffs apparently conclude that any financial interest—in the sense of an economic benefit from the arrangement, rather than in the sense of a contract or property right to some portion of the proceeds from sales of the tied product—is sufficient to support a claim of illegal tying. Plaintiffs assert that the requirement of a "financial interest in the sales of a third company" is satisfied where the developer defendants are alleged to have a "financial interest in tying Rubloff in as a management company." (Plaintiffs' Memo in Opposition, p. 18.) That plaintiffs misread the Court of Appeals is clear when one considers that the Court supports the quoted passage by citing *Crawford, Rodrigue,* and the District Court opinion in *Keener, supra,* all of which cases rejected claims of illegal tying despite significant economic benefit to the seller of the tying product. In *Crawford* the Court observed that the challenged arrangement saved Chrysler "millions of dollars in the cost of transportation." 338 F.2d at 939. In *Keener* a franchisor required franchisees to hire a designated contractor to build new restaurants. This arrangement was part of a "new image" program which the franchisor had developed, with the aid of the designated contractor, at a cost of more than $100,000; the franchisor certainly expected an economic benefit from ensuring that new buildings would fit the "new image." [1977] 2 Trade Cas. ¶ 61,682 at 72,801–02. In *Rodrigue* Chrysler required its auto dealers to purchase certain equipment from several companies unrelated to Chrysler. Chrysler acknowledged that it might benefit to the extent that the products in question would stimulate sales or promote efficiency among Chrysler dealers. 421 F.Supp. at 904. In all these cases the seller of the tying product was held not to have a sufficient interest in sales of the tied product. Given the *Sealy* Court's citation to these cases, plaintiffs' reading of the phrase "absolutely no financial interest" cannot be accepted.

*Robert's Waikiki U-Drive,* decided after *Sealy,* recognizes the distinction drawn here. Certain airlines were alleged to have tied car rentals to discounted airfares. This was a promotional device, intended to increase the airlines' volume of business, but the court rejected the tying claim, holding that the airlines did not have the required interest in the tied car rentals. The court stated:

> Plaintiffs' allegation that "substantial revenue" flowed to the airlines does not meet the economic interest test. Any time two products are sold as a package, there is presumably some benefit to both parties. There was an economic interest in the transaction—more particularly the part of the transaction that involved the payment for airfare—but that is not an economic interest in the tied product market. Showing revenue from the transaction as a whole is not enough.

491 F.Supp. at 1209. The court noted that one of the airlines involved received rebate payments, in addition to the more general economic benefits discussed in the quoted passage, and the court subjected these rebate payments to a separate analysis. The court's intelligent discussion fully supports the conclusion that enjoyment of other economic benefits is not freely to be equated with the receipt of a commission on sales.

Plaintiffs' memoranda propose several reasons why the economic benefit alleged here is more like a commission than it is like the economic benefits alleged in the cases rejecting tying claims. Plaintiffs suggest a distinction based on whether the economic benefit to the seller of the tying

product comes from the tying product itself or from the tied product. (Plaintiffs' Surreply, p. 6.) The court in *Robert's Waikiki U-Drive* observed that the airlines' economic interest was mainly in airfare, as opposed to car rental payments. 491 F.Supp. at 1209. Similarly, in discussing *Rodrigue* plaintiffs state that Chrysler "received no economic benefit from the sale of the tied product." (Plaintiffs' Surreply, p. 8.) The court doubts the value of any analysis that can be built on these hints of a theory. In most cases it probably is impossible to determine whether the economic benefit flows from sales of the tying product or from sales of the tied product. To the extent one can make such a determination in the present case, it would seem that the developer defendants' alleged economic benefit flows from the sale of their own product, condominium units, at inflated prices and with lower repair expense, rather than from the sale of management services. The distinction proposed by plaintiffs therefore does not aid their position.

Plaintiffs devote a paragraph to the proposition that the economic benefit to the developer defendants was "direct." (Plaintiffs' Surreply, p. 6.) In the *Crawford* case the Court did suggest that "direct profits" would be sufficient to support a tying claim. 338 F.2d at 939. Other courts also have used the word "direct," but the case law cannot be said to have assigned any substantive meaning to the term "direct" in this context; so, "direct" remains nothing more than a conclusory label.

Another argument is suggested in plaintiffs' discussion of the *Venzie* case. Plaintiffs assert that the court in *Venzie* undoubtedly would have found illegal tying had the licensed installation service applied the fireproofing material in a way that concealed defects in the material. Plaintiffs reason that "[t]his would give the manufacturer of the fireproofing material an economic interest in requiring purchasers to use only that applicator, just as the Developers in the instant case had an interest in the purchasers of condominiums using only Rubloff as a management service." (Plaintiffs' Surreply, p. 7.) This argument is unsatisfactory. To begin with, the licensor in *Venzie* apparently did have an interest in having only the one Philadelphia licensee install its fireproofing material; that is, "to insure proper application of its products when purchased by others." 521 F.2d at 1317. Arguably, plaintiffs' suggested reasoning can be reconciled with *Robert's Waikiki U-Drive*, as to which one might say that any car rental company would have served equally well for purposes of the airlines' promotional campaign. Or (if this is the thrust of plaintiffs' argument), the airlines did not fear that occasional use of other car rental companies would expose some flaw in the airlines' own product. If plaintiffs had developed their argument the court would be in a better position to evaluate it. As it is, the court is unable to see how plaintiffs' suggested reasoning would be useful.

It appears to the court that the case law draws a clear line when the tying and the tied products are sold by different, unaffiliated sellers. In such cases, if the seller of the tying product receives a commission or rebate on sales of the tied product, then a claim of illegal tying may be made out. Other types of economic benefits flowing to the seller of the tying product are not sufficient to support such a claim. Of course, in some cases it may be appropriate to analogize certain economic benefits to commissions or rebates, but the court is not convinced that such an analogy is appropriate in this case. The benefit alleged by plaintiffs bears little resemblance to the payment of a commission. The developer defendants are not alleged to have participated in the profits of Arthur Rubloff & Co. or in the market for management services.

In *Johnson v. Nationwide Industries, Inc.*, 450 F.Supp. 948 (N.D.Ill.1978), and *Jones v. 247 East Chestnut Properties*, [1975] 2 Trade Cas. (CCH) ¶ 60,491 (N.D.Ill. 1974), the question of economic interest in sales of the tied product apparently was not considered. In *Johnson* the court did refer briefly to this issue, but it did not

have to reach any decision. 450 F.Supp. at 950–51. *See also Johnson v. Nationwide Industries, Inc.*, No. 77 C 1162 (N.D.Ill. Dec. 6, 1979, Jan. 14, 1981), *appeal argued*, [715 F.2d 1233] No. 81–1347 (7th Cir. Sept. 24, 1980). In *Jones* the question appears not to have been considered at all. These cases therefore give no guidance to the court on this question.

For the foregoing reasons the court concludes that plaintiffs have not stated a claim of illegal tying under section 1 of the Sherman Act. Accordingly, Count I of the complaint is dismissed for failure to state a claim. Because plaintiffs' only federal count is dismissed before trial, the court declines to exercise pendent jurisdiction over the remaining counts; Counts II through IX therefore are dismissed without prejudice, for want of subject-matter jurisdiction. The case is dismissed.

It is so ordered.

#### On Motion To Alter or Amend

The court has considered the parties' submissions pursuant to the court's order of August 4, 1983, and in particular the court has considered *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476 (9th Cir.1983), and *Warner Management Consultants, Inc. v. Data General Corp.*, 545 F.Supp. 956 (N.D.Ill.1982). The court also has reviewed *Johnson v. Nationwide Industries, Inc.*, 715 F.2d 1233 (7th Cir. 1983).[1] Upon reconsideration, the court's view of the law remains the same, and the court amends its previous judgment only to the extent of correcting a clerical error.

Defendants' memoranda adequately reconcile *Roberts* and *Warner* with the court's order of July 22, 1983. The court wishes to emphasize that plaintiffs are arguing for an expansion of the tying doctrine. The

economic interest requirement is conceded to be a necessary element of a tying claim; yet, plaintiffs rely only on a type of economic incentive which, as far as the court is informed, has never been held to support a tying claim. It is worth pointing out that the traditional analysis of tying arrangements has been called into question, although new reasons have been suggested for proscribing tying. *See* R. Posner, *Antitrust Law: An Economic Perspective* 171–84 (1976). *See also* Baker, *The Supreme Court and the Per Se Tying Rule: Cutting the Gordian Knot*, 66 U.Va.L. Rev. 1235 (1980). In the court's view, no analysis of tying arrangements compels plaintiffs' proposed extension of the tying doctrine.

The court notes also plaintiffs' belated argument that the requisite economic interest may be found in an affiliation between the developer defendants and the Rubloff defendants. The court cannot agree that plaintiffs' allegations support the inference that these two sets of defendants were "business affiliates." (Plaintiffs' memo filed 9/29/83, p. 14.)

 It is appropriate for the court to address plaintiffs' belated and implicit request that their allegations be considered under the Rule of Reason. Tying, as defined by the case law, is *per se* illegal.[2] Of course, a plaintiff's failure to state a *per se* antitrust violation does not foreclose resort to a Rule of Reason analysis, and this general proposition has been noted particularly in connection with failed *per se* tying claims. *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 499–500, 89 S.Ct. 1252, 1256–1257, 22 L.Ed.2d 495 (1969); *Moraine Products v. ICI America*,

---

**1.** In a letter to the court dated September 6, 1983, the developer defendants point to *Johnson's* emphasis on the duration of the management services contract, 715 F.2d at 1236–37, and suggest that a two-year contract is reasonable as a matter of law, in view of a pertinent Illinois statute. The court has limited its consideration to the sufficiency of plaintiffs' allegations, however, and the complaint is silent as to the duration of the contract. This silence itself arguably is fatal under *Johnson*, which allocated to plain-

tiffs the burden of producing evidence that the contract is of unreasonable duration. *Id.* at 1237.

**2.** Perhaps because of uneasiness with the practical applications of the tying doctrine, courts have relaxed the *per se* rule in tying cases, allowing defendants to justify the challenged arrangement, as under Rule of Reason analysis. *See* Baker, *supra*, 66 U.Va.L.Rev. at 1250–51.

*Inc.,* 538 F.2d 134, 146, 148 (7th Cir.), *cert. denied,* 429 U.S. 941, 97 S.Ct. 357, 50 L.Ed.2d 310 (1976). Plaintiffs do not argue explicitly for Rule of Reason analysis, but they raise this issue implicitly, in their discussion of *BBD Transportation Co. v. United States Steel Corp.,* 1976 Trade Cas. (CCH) ¶ 61,079 (N.D.Cal.1976).[3] While failure to state a *per se* tying claim does not foreclose resort to a Rule of Reason theory, a failed attempt to state a *per se* tying claim does not necessarily survive a motion to dismiss merely because there has been an oblique invocation of the Rule of Reason. *Per se* claims generally do not require a thorough inquiry into whether the alleged conduct is of the type with which the antitrust laws are concerned; the purpose of *per se* rules is to avoid repeated inquiries of this kind regarding the same type of behavior. When a *per se* claim is not made out, the court cannot simply rely on a perceived resemblance between the alleged conduct and some similar conduct known to constitute a *per se* violation. Instead, the court must refer to the general standards of the antitrust laws, and must undertake "a more thorough examination of the purposes and effects of the practices involved." *Id.* 394 U.S. at 499–500, 89 S.Ct. at 1257. Plaintiffs have not argued their case in this way, and they have not put forward any particular Rule of Reason analysis.

█ In the court's view, unaided by any real argument from counsel, no Rule of Reason claim is stated. Plaintiffs' allegations disclose a scheme to sell condominium units at an inflated price by engaging a management company which would conceal substantial flaws in the condominium build-ings. Were the elements of a *per se* tying claim alleged, the court perhaps would not ask whether this is the type of scheme the Sherman Act prohibits.[4] Plaintiffs' allegations do not fall within the *per se* rule, however, and the court must ask whether the alleged conduct falls within the Sherman Act. That the alleged scheme involved both management services and condominium units creates some resemblance to *per se* illegal tying, but the court must conclude that plaintiffs' allegations do not fall within the Sherman Act. This is not a case in which a developer uses its market power for the purpose of altering the competitive structure of the market for management services, nor is this a case in which a developer uses its power in one market to squeeze a profit out of a second market. As alleged, the case is about a scheme to conceal faults from purchasers. This is not the type of conduct with which the antitrust laws are concerned. The Court of Appeals recently has stated:

> The legislators who passed the Sherman Act did not make ordinary business torts federal torts for which treble damages could be recovered; no such wholesale displacement of state tort law into the federal courts was contemplated or desired, however quaint RICO may make these nineteenth-century legislators' scruples seem.

*Sutliff, Inc. v. Donovan Companies,* 727 F.2d 648 at 655 (7th Cir.1984). *See also Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1284–85 (7th Cir.1983).[5]

In discussing the economic interest requirement, plaintiffs emphasize that their

---

3. Rule of reason analysis also is suggested in plaintiffs' letter to the court dated October 10, 1983.

4. *But see Johnson, supra,* 715 F.2d at 1237, *quoting* P. Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* 30–32 (Federal Judicial Center 1981). *See also* note 2, *supra.*

5. After noting that mere fraudulent conduct does not violate the Sherman Act, the Court in *Sutliff* and *Bunker Ramo* held that anti-competitive effect had not been alleged sufficiently. In this case the court has not addressed the issue of anti-competitive effect, basing dismissal on other considerations. The court questions whether the anti-competitive effect required to state a Rule of Reason claim can be present where only a single condominium development is concerned. *But see Mission Hills Condominium Association M–1 v. Corley,* 570 F.Supp. 453, 461 (N.D.Ill.1983) (Hart, J.). *Johnson* upheld a complaint under a *per se* tying analysis, so it did not consider whether anti-competitive effect was alleged by Rule of Reason standards.

allegations suggest an interference with the free play of market forces:

> the defendant developers tied the management services of the defendant Arthur Rubloff & Company to the sale of condominium units (thus foreclosing competition for those services) not because of the "merits" of those services, but because of a pernicious deal between the two suppliers.

(Plaintiffs' memo filed 8/26/83, p. 3; footnote omitted.) Such market interference does not mean that antitrust concerns are implicated. The economic analysis of law has attempted to show that many common-law rules are directed at punishing inefficiency or interference with market decisions, and in recent years we all have become somewhat adept at identifying the inefficiencies inherent in such conduct as negligence or conversion. Commercial fraud and misrepresentation obviously obstruct selection "on the merits" by purchasers. This attendant interference with the purchasers' market decisions and the incidental resemblance to *per se* illegal tying do not mean that plaintiffs have alleged conduct with which the antitrust laws are concerned.

In sum, the court rejects plaintiffs' theory of antitrust liability. The standards for dismissal under Fed.R.Civ.P. 12(b)(6) are said to be quite liberal in antitrust cases, in recognition of the fact that antitrust plaintiffs may be forced to plead only in general terms, as more particular facts may not be available without discovery. There is no reason, however, why a theory of antitrust liability should not be tested at the pleading stage. 2 P. Areeda & D. Turner, *Antitrust Law* § 317(e) at 78–84 (1980). Plaintiffs' theory has been tested and found wanting, so dismissal is appropriate.

It was brought to the court's attention that the judgment form dated July 22, 1983 contains a clerical error. The court amends the judgment entered herein to read: "It is ordered and adjudged that judgment by dismissal is entered in favor of the defendants and against the plaintiffs. Enter judgment." In all other respects the motion to alter or amend the court's judgment is denied.

It is so ordered.