Louis MARTINO, et al., Plaintiffs,

v.

McDONALD'S SYSTEM, INC., et al., Defendants.

Michael MARTINO, et al., Plaintiffs,

v.

McDONALD'S CORPORATION, a Delaware corporation, Defendant.

Nos. 75 C 3455, 77 C 98.

United States District Court, N.D. Illinois, E.D.

Dec. 6, 1985.

Louis C. Keller, Jr., Gary Senner, Earl Pollock, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

These cases were originally filed to challenge, as a *per se* illegal tie-in contrary to Section 1 of the Sherman Act, 15 U.S.C. § 1, McDonald's contractual requirement that franchisees must buy and use Coca-Cola as its only sugar-sweetened cola beverage. The standard franchise agreement restricts franchisee purchases to "approved menu items" and only Coca-Cola has been designated as an approved sugar-sweetened cola.

Mindful of developing case law, plaintiffs later amended their complaint to allege that the practice was, alternatively, an unreasonable restraint of trade. *See Fortner Enterprises, Inc. v. United States Steel Corp. (Fortner I)*, 394 U.S. 495, 499–501, 89 S.Ct. 1252, 1256–1257, 22 L.Ed.2d 495 (1969).[1] That led to a motion *in limine* for a ruling that the plaintiffs' complaint, on its face and on the undisputed facts, is legally insufficient in charging a *per se* illegal tying arrangement. A ruling on that motion would have affected, at most, the way the case would be tried; continual skirmishing over whether the case was properly a class action at all was still in progress; and, after a ruling that it was,[2] the first action had to be brought procedur-

George F. Galland, Jr., Judson H. Miner, Charles Barnhill, Jr., Davis, Miner & Barnhill, Chicago, Ill., for plaintiffs.

1. "Plaintiffs" is and will be used in a general sense. The plaintiffs in the first action are former franchisees; plaintiffs in the second action are, or at least until more recently, were current franchisees. The plaintiffs in the first action did not amend their complaint to allege an unreasonable restraint of trade until long after the plaintiffs in the second action, but the cases are parallel now. The court, for simplicity of discussion, will treat the actions as if all plaintiffs had filed a single complaint which had a single procedural history.

2. Whether or not plaintiffs could prove fact of injury on a class basis sufficiently to justify a class action was considered by Judge Marshall in *Martino v. McDonald's System, Inc.*, 81 F.R.D. 81 (N.D.Ill.1979), and subsequently reconsidered by this court, slip. op., 10/19/84. As the latter opinion indicates, a third judge has also dealt with the issue, and a fourth judge briefly had responsibility for the cases. That responsibility was, however, so brief that, mercifully, she was not called upon yet again to review what was and remains a troublesome question. *See generally*, Hovenkamp, *Tying Arrangements and Class Actions*, 36 Vand.L.Rev. 213 (1983). That the litigation could be maintainable as a class action presupposes that the challenged requirement is impermissibly pernicious. No judge has as yet considered the legality of the requirement itself, the closest being Judge Marshall's presumption that proof of market dominance would be classwide because of a sufficiently unique trademark. 81 F.R.D. at 90. That presumption has to yield to subsequent controlling law, as later here discussed.

ally parallel to the second. The motion *in limine* was, therefore, held in abeyance. The two actions are now parallel, the parties are now prepared to finish what discovery remains to be done, and the matter is set for trial. Defendant has moved for summary judgment.

The complaint alleges, simply, that McDonald's explicitly requires its franchisees to purchase Coca-Cola and no other sugar-sweetened cola, that the imposition of the requirement constitutes both a *per se* unlawful tying arrangement and an unreasonable restraint of trade, and that the requirement has caused franchisees to pay a higher price for cola syrup than they otherwise would have had to pay. The motion *in limine*, as originally filed, rested upon the undisputed facts that defendant does not sell Coca-Cola to its franchisees, nor does it receive any rebate or commission on Coca-Cola's sales to franchisees. Due to the nature of Coca-Cola's distribution system, franchisees buy Coca-Cola syrup from a number of sources, with some variation of price depending on the source. Franchisees can shop around. That was a material fact bearing upon the "fact of injury" issue, which was paramount in the dispute over class certification.

Plaintiffs responded by urging that McDonald's did have an economic interest in the requirement. McDonald's, throughout the relevant period, has developed advertising formats through advertising agencies. Franchisees are committed to the expenditure of a stated percentage of their gross for advertising. Almost all have, over the years, discharged some or all of that obligation by contributions to OPNAD (the operators' national advertising fund), which was separate from McDonald's. OPNAD then pays for the media expense of national television, radio and print advertising and promotions. Franchisees can, and do, also satisfy that obligation by cooperative advertising in regional markets, using national formats. They may also satisfy that obligation by individual advertising, subject to verification that it occurred. Until the end of 1972 (the relevant time period begins in October 1971 for the first action;

the plaintiffs contend, and defendant disputes, that it began at the same time for the second action), Coca-Cola paid advertising allowances to the OPNAD fund. Since the beginning of 1973 Coca-Cola has paid that allowance directly to the franchisees, which then use it to defray OPNAD contributions or for cooperative regional advertising or individual advertising programs. The allowance was and is for the purpose of promoting Coca-Cola in conjunction with other McDonald's products, although the nature of the Coca-Cola exposure is not specified. Plaintiffs appear to argue that OPNAD is McDonald's-controlled, that until 1973 the allowance was in practical effect to McDonald's, and that since then the encouragement of advertising participation through OPNAD and regional programs has resulted in a change in form but not substance since the allowance "still goes into McDonald's Coke-related advertising." The amount of that allowance influences, or may influence, McDonald's ongoing review of whether or not to stick with its Coca-Cola requirement. Thus, insist plaintiffs, the Coca-Cola requirement leads to allowances which are funneled into advertising controlled by McDonald's and thus primarily benefiting defendant, giving McDonald's a financial interest in Coca-Cola syrup sales to franchisees.

Plaintiffs' response to the motion *in limine* did not deal with their "rule of reason" concept, since the motion was restricted. Defendant now urges, in light of *Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co.,* 758 F.2d 203 (7th Cir.1985), that its lack of economic interest in Coca-Cola syrup sales disposes of plaintiffs' rule-of-reason theory as well, and it moves for summary judgment. Plaintiffs dispute *Carl Sandburg's* impact upon their tie-in theory and contend that it has nothing to do with their rule-of-reason argument. According to plaintiffs, the Coca-Cola syrup requirement is a vertical restraint wholly apart from tie-in law. It restricts the ability of a franchisee or a syrup seller other than Coca-Cola, or both, to compete and

therefore is, without regard to any economic interest by McDonald's, an unreasonable restraint of trade absent a yet to be litigated competitive justification.

In *Carl Sandburg*, the district court dismissed a complaint which alleged that a condominium developer's sale of condominium units subject to two-year management contracts with an unaffiliated company was an unlawful tie-in and (somewhat more equivocally) was an unreasonable restraint of trade. The court held that the sellers of the tying product, condominiums, were not alleged to have a sufficient economic interest in the management services contract, the tied product. 586 F.Supp. 155, 158 (N.D.Ill.1983 and 1984). Plaintiffs, conceding that they were not claiming any direct financial interest by the developers by way of commissions or rebates, contended that it was enough that the developers were receiving an economic benefit from the failure of the management services defendants to disclose defects to potential buyers and that they, the plaintiffs, could have purchased better and less expensive management services elsewhere. The district court, 586 F.Supp. 155 at 159, concluded after considerable discussion of the case law, which need not be repeated here, that such an identifiable economic benefit was insufficient to claim illegal tying. Plaintiffs then asked for review under the rule of reason. The district court concluded that the conduct alleged was not within the concern of the Sherman Act. *Id.* at 161–162. The Court of Appeals affirmed, holding that some economic benefit amounting to a commission or rebate is required for a tying claim. 758 F.2d at 208. It went on to state that a rule-of-reason claim in a tying context likewise requires a substantial danger that the tying seller will acquire market power in the tied product market. When the seller of the tying product has no financial interest in the tied product and the tied product is independently priced there is no danger to competition and no actionable conduct. 758 F.2d at 210–211.

If *Carl Sandburg* means what it says, then plaintiffs cannot prevail in these actions. A review of the legal context from which *Carl Sandburg* arises persuades this court that it does mean what it says in the circumstances presented here, and that, accordingly, defendants are entitled to summary judgment.

We turn first to tying arrangements as *per se* violations. As many have noted, the designation of conduct as a *per se* violation is a judicial conclusion that the conduct is so pernicious that no extended analysis of its anticompetitive effects in a particular market is necessary. "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). It is a useful judicial shortcut so long as it generally although not invariably accords with economic reality. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 350–351, 102 S.Ct. 2466, 2476, 73 L.Ed.2d 48 (1982). The classic *per se* violation remains price-fixing among competitors. Since at least 1947 tying arrangements have also been illegal *per se. International Salt Co., Inc. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The classic condemned tying arrangement was and remains the monopolist requiring purchase from it of an unwanted or excessively-priced product as a requirement for purchasing the desired product controlled by the seller. While the anticompetitive impact of tying arrangements in vertical distribution systems has been vigorously questioned, *e.g.*, Easterbrook, *Vertical Arrangements and the Rule of Reason*, 51 Antitrust L.J. 135 (1984), there can be little dispute that tying arrangements resulting in the extension of market power over another product as evidenced by price discrimination is a *per se* violation.

■ In its simplest form, it is a *per se* violation for one with sufficient economic power with respect to a tying product to

appreciably restrain free competition in the market for a tied product by conditioning the sale of the tying product upon the purchaser's agreement to purchase the tied product. *Northern Pacific Ry. Co. v. United States, supra,* 356 U.S. at pp. 5, 6, 78 S.Ct. at 518. Presumably, then, if there is a tie resulting from the exercise of market power which appreciably restrains competition in the tied product, causing injury, then the *per se* rule, it could be argued, imposes liability. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 375 (5th Cir.1977).

The judicial shortcut has never, however, been that abrupt. The rule is not an end in itself but a means to an end, an expeditious way of proscribing anticompetitive conduct. Legal writers are fond of pointing out that it is permissible to require a shoe purchaser to purchase both a right and left shoe. That can be characterized as not involving a tie because the shoes are one product, a concept extended into the franchise cases, *e.g., Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348 (9th Cir.1982); *Principe v. McDonald's Corp.,* 631 F.2d 303 (4th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981). That extension would appear, however, to be limited by the emphasis in *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), to separate product markets, despite some question whether franchise systems, for sec. 1 purposes, should be treated as a single product. *See Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 670 n. 1, (7th Cir.1985). There are, after all, distinctive markets for McDonald's brand products or McDonald's franchises and for Coca-Cola or sugar-sweetened cola beverages generally.

What the courts have condemned "... is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 611, 73 S.Ct. 872, 882, 97 L.Ed. 1277 (1953). There has been, however, a recognition, perhaps an increasing recognition, that vertical restraints upon intrabrand competition may promote interbrand competition. *Monsanto Company v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). The competitive benefits of franchise distribution systems have been often noted, *e.g., Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1222–1223 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). The "single product" concept has been a means of ameliorating the rigors of the *per se* rule. The rule has been qualified by a business justification or quality control exception, *Carpa v. Ward Foods, Inc.,* 536 F.2d 39 (5th Cir.1976), so long as the control method adopted was the least restrictive means of accomplishing the purpose. Other concepts have arisen for the same purpose. *See generally,* ABA Antitrust Section, Monograph No. 8, *Vertical Restrictions upon Buyers Limiting Purchases of Goods from Others* (1982). And, increasingly, the *per se* rule has yielded to a redefinition of market power and more searching market analysis. Plaintiffs insist that the law has remained unchanged. Perhaps that is so when we look only to verbal formulations. In that sense, all continue to worship at the same altar. The beliefs of the worshipers have, however, perceptively changed.

The first action here was filed back before *United States Steel Corp. v. Fortner Enterprises, Inc. (Fortner II),* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), and the second action was filed shortly thereafter. *Fortner II,* picking up upon a footnote in *Fortner I,* 394 U.S. at 505 n. 2, 89 S.Ct. at 1259 n. 2, emphasized the necessity for market power in the tying product sufficient to raise prices in the tied product or, alternatively, force acceptance of an unwanted tied product, 429 U.S. at 617–622, 97 S.Ct. at 866–868. Shortly thereafter, in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 54–55, 97 S.Ct. 2549, 2559–2560, 53 L.Ed.2d 568 (1977), the Court recognized that vertical restraints may have redeeming virtues, including prevention of "free rider" effects which reduce distribution alternatives (a consideration

germane to McDonald's advertising campaign structure but not, in view of the positions of the parties, discussed by them in this case). *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560, refused to abandon the *per se* doctrine in tying cases, but it further emphasized the necessity for market power and for extensive economic analysis. Four justices would have jettisoned a *per se* approach altogether. 104 S.Ct. at 1570 (O'Connor, J., concurring in judgment). The necessity for extensive economic analysis, because of possible procompetitive justification and to determine actual market power, has since been echoed in *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 2962 n. 26, 82 L.Ed.2d 70 (1984), and in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. ——, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985). *Monsanto v. Spray Rite*, 465 U.S. at 766, 104 S.Ct. at 1472 (1984) recognized, at least implicitly, that dealers in a vertical distribution system do not have an unfettered right to make independent decisions.

Even if there has been no change in the analytic approach, as plaintiffs insist, there has been a change in emphasis, particularly in this circuit. *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), assumed that a trademark carried with it a presumption of market power, as it gave some power over some buyers (*Fortner I*). It is a far cry from *Will*, 669, where tying is termed "not cooperation among competitors, the focus of § 1, it is aggressive conduct akin to monopolization under § 2 of the Sherman Act." *Will* implies (at 672) that market power, at least in the absence of direct proof of price discrimination, requires a market share in the tying product of more than 30 per cent so as to command an ability to control price in the tied product. The opinion leans toward the benchmarks for determining whether or not a monopoly in one relevant product market is the basis

for attempted monopolization in another, although it stops short of so deciding.

Other cases have looked to market power in the tying product market, *e.g.*, *Yentsch v. Texaco, Inc.*, 630 F.2d 46 (2d Cir.1980); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir.1984); *Spartan Grain & Mill Co. v. Ayers*, 735 F.2d 1284 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 785, 83 L.Ed.2d 779 (1985). If we look solely to general market power, that emphasis may well doom franchise trademark cases, and almost certainly fast food franchise cases. *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 705 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984). McDonald's was a pioneer, but one need only step outside this courthouse to observe perhaps half a dozen fast food franchises within a block. Driving along a strip commercial area is a continuous exposure to a cacophony of presumed gastronomical delights. Indeed, plaintiffs do not allege that kind of market power and this court is unaware of any intention to assert or seek to prove that here.

We are talking about a market in which there is competition for new franchisees. Obviously there is almost invariably disparate economic power between a franchiser and an already existing single franchisee, although the cooperative efforts of franchisees may more evenly balance that economic power; and the self interest of the franchiser which, after all, must seek more franchises and keep existing franchisees relatively satisfied, may mute the exercise of power. That disparity has led to both state and federal legislation to curb franchise abuses, and the introduction of some restraints upon pain of termination may well violate the antitrust laws. Here, however, we are dealing with requirements which always, or at least for many years, have been part of the franchise agreements.

Market share may indicate market power. That power also can arise from a legal advantage, such as a patent or a physical advantage, such as land, which results in

an economic advantage which is not and cannot be shared by competitors. *Spartan Grain & Mill Co. v. Ayers, supra.* Perhaps, as well, market power may be evidenced by actual price discrimination in less than the relevant market (*Spartan Grain* indicates it cannot) and, if so, *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir.1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), lives on. Enhanced price, which was present there, could be explained as a means of charging franchise fees. It can also indicate leverage. Given the various alternatives for obtaining franchise revenue which do not affect the price of supplies, it may well be that courts will conclusively presume that trademarks confer sufficient market power upon proof of price discrimination or that, at least, the price discrimination is itself sufficient to prove sufficient market power conferred by a trademark. The real concern is, after all, market power which results in a monopoly return upon the tying products by means of leveraged price discrimination in the tied product. *Moore v. Jas H. Matthews & Co.*, 550 F.2d 1207 (9th Cir.1977). Litigating that ambiguity may make little sense when the franchiser has alternate and unambiguous means for obtaining its revenues.

■ Where does that leave us? The *per se* doctrine may have some real vitality when there is proof of one aspect of leverage, invasion of a second market, and also proof of a direct economic interest in the tied product even absent a showing of actual market power. Without that economic interest in the second product, however, the vertical restraint is not a tying arrangement for the purposes of that judicial shorthand, the *per se* rule.

■ That sufficient economic interest cannot be established here. Here the economic benefit to McDonald's is general. Coca-Cola paid allowances directly to OPNAD until 1973, but those funds had to be used for advertising presumably of benefit both to franchiser and franchisee. Plaintiffs' suggestion that some franchisees may not have benefited from national advertising as much as others is beside the point (as well as conflicting with class action concepts), as all franchisees, wherever situated, benefit from the conditioning of a mobile population to the virtues of McDonald's. A family from New York may well stop at a McDonald's at Ottumwa, Iowa, because of its media exposure in New York. In any event, there is no evidence tending, in any substantial way, to show that McDonald's had itself access to the allowance, even prior to 1973, or that it was used, through some affiliated entity, for purposes for which McDonald's had responsibilities to the franchisees and which it satisfied through diverted allowances. *See Miller Motors, Inc. v. Ford Motor Company*, 252 F.2d 441 (4th Cir. 1958), relied upon by the Court of Appeals in *Carl Sandburg*, 758 F.2d at 208. Accordingly, plaintiffs cannot establish a *per se* violation.

■ Plaintiffs urge that even if the restraint is not a tying arrangement subject to attack as a *per se* violation it is a vertical restraint which a trier of fact must judge by the rule of reason despite the absence of any economic interest in the sale of Coca-Cola syrup. True enough, it is a vertical restraint. True enough, failure to establish a *per se* violation does not necessarily foreclose an attack upon conduct as being an unreasonable restraint of trade in a relevant market. *Carl Sandburg*, 758 F.2d at 210. The conduct under attack here is, however, still akin to a tying arrangement even if it is not subject to the *per se* rule. The same analysis which takes it outside the *per se* rule also causes it to pass muster under the rule of reason. As *Carl Sandburg* discusses, the danger is that the tying seller will acquire market power in the tied product market. Absent a financial interest, the tying seller will not be using its market power in the tying product market to invade a second market and the tied goods will be (as they are here) independently priced by separate financial entities. Perhaps there can be instances in which tying arrangements escape *per se* analysis but run afoul the rule of reason,

although that has been questioned. Posner, *The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision*, 45 U. of Chgo.L.R. 1 (1977). Certainly, though, there is a disinclination to conclude that conduct may possibly be an unreasonable restraint after an extended analysis has determined that it is so divorced from antitrust concerns that it should not be subject to the *per se* rule. That disinclination finds vivid expression in *Carl Sandburg* and it is controlling here.

 The reason for that is also well illustrated here. In the absence of an economic interest in the sale of Coca-Cola syrup, McDonald's interest is in a standard menu with, additionally perhaps, an interest in linkage to a product well perceived by consumers. If that vertical restraint is suspect, requiring a trial to determine economic justification, then every specification is suspect, whether it be the size or fat content of hamburgers or in what oil they should be cooked. Virtually every franchisee probably has some menu change which he believes would be more to the liking of local tastes. But McDonald's rests upon a distribution system emphasizing uniformity. Franchisees depend, obviously, upon the certainty that each will provide the same menu and the same services.[3] Hamburgers of uniform size and uniform fat content may not appeal to the epicure but they may well appeal to the parents of hungry children in the back seat. Designating menu selections and specifications, without more, does not implicate the antitrust laws.

 A rule-of-reason analysis requires a consideration of adverse economic effects upon competition in the relevant product market. Perhaps, as plaintiffs' claim, unrestricted competition between Pepsi-Cola and Coca-Cola for the trade of McDonald's franchisees might have some favorable impact on the price of those colas to them. But the issue is impact upon competition in the sugar-sweetened cola syrup market. If McDonald's so dominated the cola market through its purchases that the restraints substantially affected competition in the rest of the market then the Court of Appeals would have to rethink its somewhat sweeping generalizations in *Carl Sandburg*. But that is not the fact. Plaintiffs urge that McDonald's uses close to 18 per cent of Coca-Cola's domestic syrup, obviously a not inconsiderable volume. Just as obviously, McDonald's use of Coca-Cola syrup is far less than 18 per cent of the volume of sugar-sweetened cola syrup sold in the United States. Plaintiffs have consistently conceded the vigorous competition between Pepsi-Cola and Coca-Cola in the sugar-sweetened cola syrup market. It is that competition which is the basis for their claim that their access to both syrups could favorably affect the price to them. In the absence of any economic interest and in the absence of any showing that the restraint lessens competition in the overall market, *Carl Sandburg*, supplemented by *Will*, does mean what it says.

---

**3.** Indeed, plaintiffs do not contend that every franchisee has a statutory right to serve whatever he believes will foster his individual economic interests. The thrust of their argument has always been that franchisees should have a right to market Pepsi-Cola as well as Coca-Cola. It is interesting that almost all current franchisees have opted out. Perhaps they did so because they were convinced that they could not beat city hall, or at least did not want to try. It may be, however, that many believe the present system best serves their economic interests and that they do not want a proliferation of menu items. If so, that raises a question as to whether, as courts have generally assumed, written requirements in a franchise agreement are conclusively coercive for sec. 1 purposes.